1    DAVID R. EBERHART (S.B. #195474)
     deberhart@omm.com
2    RYAN J. PADDEN (S.B. #204515)
     rpadden@omm.com
3    DAVID J. SEPANIK (S.B. #221527)
     dsepanik@omm.com
4    O'MELVENY & MYERS LLP
     Two Embarcadero Center, 28th Floor
5    San Francisco, CA  94111
     Telephone:    (415) 984-8700
6    Facsimile:    (415) 984-8701

7    Attorneys for Plaintiff
     APPLE INC.
8

9                        UNITED STATES DISTRICT COURT

10                     NORTHERN DISTRICT OF CALIFORNIA

11                              OAKLAND DIVISION

12   APPLE INC., a California corporation,      Case No. CV 11-01327 PJH

13                   Plaintiff,                 **APPLE INC.'S NOTICE OF MOTION
                                                AND MOTION FOR PRELIMINARY
14          v.                                  INJUNCTION**

15   AMAZON.COM, INC., a Delaware               **Fed. R. Civ. P. 65(a); Civ. L.R. 65-1**
     corporation, and AMAZON DIGITAL
16   SERVICES, INC., a Delaware corporation,    Date:         June 22, 2011
                                                Time:         9:00 A.M.
17                   Defendants.                Courtroom:    3, 3rd Floor
                                                Judge:        Hon. Phyllis J. Hamilton
18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION

2  TO AMAZON.COM, INC., AMAZON DIGITAL SERVICES, INC. AND THEIR

3  ATTORNEYS OF RECORD:

4          PLEASE TAKE NOTICE that on June 22, 2011, at 9:00 a.m., or as soon thereafter

5  as the matter may be heard in the above-entitled Court located at Courtroom 3, 3rd Floor, United

6  States Courthouse, 1301 Clay Street, Oakland, California, Plaintiff Apple Inc. will and hereby

7  does move this Court to preliminary enjoin Defendants Amazon.com., Inc. and Amazon Digital

8  Services, Inc., as well as any related entity or person acting in concert with them, from any use of

9  the APP STORE trademark or any confusingly similar mark, including but not limited to

10  APPSTORE.  Apple makes this motion pursuant to Federal Rule of Civil Procedure 65.

11          This motion is based on the attached Memorandum of Points and Authorities, the

12  pleadings on file in this matter, such other relevant materials and evidence as may be presented to

13  the Court, and any further grounds the Court deems just and proper.

14

15          Dated:    April 13, 2011

16                                            O'MELVENY & MYERS LLP

17

18                                            By: /s/ David R. Eberhart
                                                  DAVID R. EBERHART

19                                            Attorneys for Plaintiff
20                                            APPLE INC.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................... 1

II.    STATEMENT OF FACTS ....................................................................................... 3

    A.    Apple Launches A Unique Service .................................................................. 3

    B.    Apple Chooses And Promotes A Unique Mark: APP STORE ............................ 5

    C.    Apple Vigorously Protects Its APP STORE Mark ................................................ 6

    D.    Amazon's Misuse Of Apple's APP STORE Mark ................................................ 6

III.   ARGUMENT ............................................................................................................ 8

    A.    Apple Is Likely To Succeed On The Merits Of Its Infringement Claim ............... 8

        1.    Apple Owns And May Protect The APP STORE Mark ............................ 8

            a.    APP STORE Is Suggestive And Inherently Distinctive ................ 8

            b.    The APP STORE Mark, Even If Considered To Be Descriptive, Has Acquired Secondary Meaning ........................... 9

            c.    APP STORE Is Not A Generic Term ............................................ 11

        2.    Amazon's Use Is Likely to Confuse Consumers ..................................... 12

            a.    Internet Trinity Factor 1: The Parties' Marks Are Virtually Identical ....................................................................................... 13

            b.    Internet Trinity Factor 2: The Parties' Services Are Related ........ 14

            c.    Internet Trinity Factor 3: The Parties' Market Their Services Through The Same Channels .......................................... 15

            d.    Other Sleekcraft Factors ............................................................... 15

    B.    Apple Is Likely To Succeed On The Merits of Its Dilution Claim ....................... 17

        1.    Apple's APP STORE Mark Is Famous ..................................................... 18

        2.    Amazon Is Making Commercial Use Of The Mark ................................. 19

        3.    Amazon's Use Began After The Mark Became Famous .......................... 19

        4.    Amazon's Use of APPSTORE Will Dilute Apple's Mark ....................... 19

            a.    Amazon's Use Blurs The Distinctiveness Of Apple's Mark ........ 19

            b.    Amazon's Use Will Tarnish Apple's Mark .................................. 21

    C.    Apple Will Suffer Irreparable Harm If an Injunction Is Not Ordered .................. 23

    D.    The Balance of Hardships Strongly Favors Apple ................................................. 23

    E.    The Public Interest Favors an Injunction ............................................................. 24

IV.    CONCLUSION ........................................................................................................ 25

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,*
   470 F.2d 689 (2d Cir. 1972) ........................................................................... 14

5

*Acad. of Motion Picture Arts & Scis. v. Creative House Promotions,*
   944 F.2d 1446 (9th Cir. 1991) ........................................................................ 22

6

*Adidas Am., Inc. v. Payless Shoesource, Inc.,*
   529 F. Supp. 2d 1215 (D. Or. 2007) ............................................................... 18

7

*AMF, Inc. v. Sleekcraft Boats,*
   599 F.2d 341 (9th Cir. 1979) ....................................................... 13, 14, 15, 17

8

*Apple Computer, Inc. v. Formula Int'l, Inc.,*
   725 F.2d 521 (9th Cir. 1984) .................................................................... 23, 24

9

10

*Apple Computer, Inc. v. Franklin Computer Corp.,*
   714 F.2d 1240 (3d Cir. 1983), *cert. dismissed,* 464 U.S. 1033 (1984) ................. 24

11

*Applied Info. Scis. Corp. v. eBay, Inc.,*
   511 F.3d 966 (9th Cir. 2007) ........................................................................... 8

12

*Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.,*
   174 F.3d 1036 (9th Cir. 1999) .................................................. 13, 14, 15, 24

13

*Cadence Design Sys., Inc. v. Avant! Corp.,*
   125 F.3d 824 (9th Cir. 1997) ........................................................................... 8

14

*Caesars World, Inc. v. Milanian,*
   247 F. Supp. 2d 1171 (D. Nev. 2003) ............................................................ 24

15

16

*Cal. Cooler, Inc. v. Loretto Winery, Ltd.,*
   774 F.2d 1451, 227 U.S.P.Q. 808 (9th Cir. 1985) ........................................ 12

17

*Comm. for Idaho's High Desert, Inc. v. Yost,*
   92 F.3d 814 (9th Cir. 1996) ........................................................................... 11

18

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,*
   843 F.2d 600 (1st Cir. 1988) .......................................................................... 24

19

20

*Credit Counseling Ctrs. of Am., Inc. v. Budget & Credit Counseling Servs., Inc.,*
   1997 WL 115645 (S.D.N.Y. 1997) ................................................................... 9

21

*CytoSport, Inc. v. Vital Pharms., Inc.,*
   617 F. Supp. 2d 1051 (E.D. Cal. 2009), *aff'd,* 348 F. App'x 288 (9th Cir. 2009) ....... 11

22

*Door Sys., Inc. v. Pro-Line Door Sys.,*
   83 F.3d 169, 38 U.S.P.Q.2d 1771 (7th Cir. 1996) ........................................ 12

23

24

*Dr. Seuss Enters., LP v. Penguin Books USA, Inc.,*
   109 F. 3d 1394 (9th Cir. 1997) ...................................................................... 16

25

*Dreamwerks Prod. Grp., Inc. v. SKG Studio,*
   142 F.3d 1127 (9th Cir. 1998) ....................................................................... 13

26

*Eli Lilly & Co. v. Natural Answers, Inc.,*
   233 F.3d 456 (7th Cir. 2000) ......................................................................... 16

27

28

# TABLE OF AUTHORITIES
### (continued)

Page

*Fin. Exp. LLC v. Nowcom Corp.*,
   564 F. Supp. 2d 1160 (C.D. Cal. 2008) ................................................................. 9

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ........................................................................ 8, 16

*Golden Door, Inc. v. Odisho*,
   646 F.2d 347 (9th Cir. 1980) .............................................................................. 16

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ........................................................ 8, 15, 16, 23, 24

*Hotmail Corp. v. Van$ Money Pie Inc.*,
   47 U.S.P.Q. 2d 1020 (N.D. Cal. 1998) ................................................................ 18

*In re Dial-A-Mattress Operating Corp.*,
   240 F.3d 1341, 57 U.S.P.Q.2d 1807 (Fed. Cir. 2001) ......................................... 11

*In re Trek 2000*,
   97 U.S.P.Q.2d 1106 (2010) ................................................................................. 12

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
   846 F.2d 1079 (7th Cir. 1988) ............................................................................ 14

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
   304 F.3d 936 (9th Cir. 1999) ......................................................................... 12, 17

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008) ......................................................................... 18, 20

*Japan Telecom, Inc. v. Japan Telecom Am., Inc.*,
   287 F.3d 866 (9th Cir. 2002) ............................................................................... 9

*Johnson & Johnson Consumer Co. v. Aini*,
   540 F. Supp. 2d 374 (E.D.N.Y. 2008) ................................................................. 22

*Kellogg Co. v. Nat'l Biscuit Co.*,
   305 U.S. 111 (1938) ............................................................................................. 9

*Lahoti v. VeriCheck, Inc.*,
   586 F.3d 1190 (9th Cir. 2009) ............................................................................. 9

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
   __ F.3d __, No. 09-16322, 2011 WL 383972 (9th Cir. Feb. 8, 2011) .................... 20

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ............................................................................... 8

*Network Automation v. Advanced Systems Concepts, Inc.*,
   __ F.3d __, 2011 WL 815806 (9th Cir. Mar. 8, 2011) ......................................... 13

*Nike, Inc. v. NikePal Int'l, Inc.*,
   No. 05-1468, 2007 WL 2782030 (E.D. Cal. Sept. 18, 2007) ................................ 18

*PerfumeBay.com v. eBay, Inc.*,
   506 F.3d 1165 (9th Cir. 2007) ............................................................................ 18

*Protectmarriage.com v. Courage Campaign*,
   680 F. Supp. 2d 1225 (E.D. Cal. 2010) ................................................................ 9

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Schmidt v. Quigg,*
     609 F. Supp. 227 (D.C. Mich. 1985)..................................................... 9

4   *Sengoku Works v. RMC Int'l,*
     96 F.3d 1217 (9th Cir. 1996) .............................................................. 11

5   *Sierra On-Line v. Phoenix Software, Inc.,*
     739 F.2d 1415 (9th Cir. 1984)............................................................ 10

6   *The Money Store v. HarrisCorp Fin., Inc.,*
     689 F.2d 666 (7th Cir. 1982)................................................................ 8

7   *Toho Co. v. William Morrow & Co.,*
     33 F. Supp. 2d 1206 (C.D. Cal. 1998) ............................................... 16

8   *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,*
     559 F. Supp. 1189 (E.D.N.Y. 1983)................................................... 13

9   *Transgo, Inc. v. AJAC Transmission Parts Corp.,*
     768 F.2d 1001 (9th Cir. 1985)............................................................. 9

10  *Two Pesos v. Taco Cabana,*
     505 U.S. 763 (1992)............................................................................. 9

11  *Ty Inc. v. Softbelly's Inc.,*
     353 F.3d 528, 69 U.S.P.Q.2d 1213 (7th Cir. 2003) .......................... 12

12  *Vertos Med., Inc. v. Globus Med., Inc.,*
     No. 09-1411 PJH, 2009 WL 3740709 (N.D. Cal. Nov. 6, 2009)........ 16, 23

13  *Visa Int'l Serv. Ass'n v. JSL Corp.,*
     610 F.3d 1088 (9th Cir. 2010)....................................................... 20, 21

14  *Winter v. Natural Res. Def. Council, Inc.,*
     555 U.S. 7, 129 S. Ct. 365 (2008)........................................................ 8

15  *Zobmondo Entm't LLC v. Falls Media, LLC,*
     602 F.3d 1108 (9th Cir. 2010).............................................................. 8

**STATUTES**

15 U.S.C. § 1052(f) ...................................................................................... 11

15 U.S.C. § 1064(3) ...................................................................................... 11

15 U.S.C. § 1125(c) ...................................................................................... 18

15 U.S.C. § 1125(c)(2)(A) ............................................................................ 18

15 U.S.C. § 1125(c)(2)(B) ....................................................................... 19, 20

15 U.S.C.A. § 1125(c)(2)(C)..................................................................... 21, 22

**RULES**

1 Gilson, *Trademark Protection & Practice*, § 2.09[1] .................................. 9

4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 24:72 ..................... 17

PTO Notation of Publication & Issue Review Complete,
     Trademark Application Serial No. 77/525,433, Dec. 3, 2009.................. 11

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.**     <u>**INTRODUCTION**</u>

3          Apple invested three years of effort and hundreds of millions of dollars to establish a

4  public association between Apple and its APP STORE™ mobile software download service.

5  Very recently, Amazon launched a competing mobile software download service using the mark

6  APPSTORE.  Amazon's unlawful appropriation of Apple's trademark infringes and dilutes

7  Apple's mark, and Apple seeks an order preliminarily enjoining Amazon's use of that mark or

8  any confusingly similar mark.

9          The APP STORE service is revolutionary, allowing users of Apple's iPhone®, iPod®,

10  and iPad® mobile devices to browse for and license a wide range of third party software

11  programs.  The APP STORE service has transformed the way mobile device users obtained

12  software for their devices—particularly by making it easy for all users, including less technology-

13  savvy users, to find, license, download, and install mobile software—and the service has

14  experienced phenomenal growth and success.  In the first two months after the APP STORE

15  service launched in July 2008, consumers downloaded more than 100 million software programs

16  from the service.  Over 160 million devices worldwide now can access the APP STORE service,

17  and consumers have downloaded software programs more than 10 billion times via the service.

18          Apple has extensively advertised, marketed, and promoted the APP STORE service and

19  the APP STORE mark, spending hundreds of millions of dollars on print, television, and internet

20  advertising.  News outlets also have commented extensively and repeatedly on the success of the

21  APP STORE service.  The enormous public attention given the APP STORE service, and the

22  tremendous public acceptance of the service, have cemented the public's identification of APP

23  STORE as an Apple trademark.

24          Apple's use of the term APP STORE as a means of branding its new service was also

25  unique: that term was not in general use and only suggests an online marketplace for mobile

26  software downloads.  As a suggestive mark, APP STORE is distinctive and protectable.  But even

27  if the mark were viewed as descriptive, it is protectable because the public has come to associate

28  the APP STORE mark with Apple.  Apple has registered rights for the APP STORE mark

1   covering over 50 countries.  In the United States, the Patent And Trademark Office recognized

2   that APP STORE is Apple's exclusive trademark and approved Apple's application; however,

3   Microsoft Corporation opposed that application, and that opposition is currently pending before

4   the TTAB.

5          Other competitors resisted the temptation to trade on Apple's goodwill, choosing names

6   for their services that did not infringe the APP STORE mark.  (Despite its opposition, even

7   Microsoft does not use the mark.)  Amazon chose otherwise.  On March 22, 2011, Amazon

8   launched its APPSTORE service, offering many of the same software titles as Apple licenses via

9   its APP STORE service.  Amazon's appropriation of Apple's mark threatens to confuse

10  consumers and destroy the value of Apple's APP STORE mark.  Moreover, Amazon's use of the

11  APP STORE mark—while RIM, Samsung, Intel, Nokia, Google, and others do not—reinforces

12  the mistaken notion that Amazon operates an extension or new outlet for Apple's service.

13         Amazon may argue that consumers will not be confused because, at present, Amazon's

14  service does not offer software compatible with Apple's mobile devices.  But that distinction will

15  be lost on many consumers.  Apple opened the door for almost any user of an Apple mobile

16  device to obtain inexpensive or free mobile software, thereby expanding the market far beyond

17  customers with elevated technical skills.  Amazon is using Apple's mark and Amazon's retail

18  power to bring consumers in Amazon's proverbial door.  Once there, consumers may very well

19  realize that it is not Apple's service, but by that time, Amazon already has them where it wants

20  them.  This is classic initial interest confusion.

21         Amazon's actions also will dilute the distinctive character of Apple's mark by both

22  blurring and tarnishment.  As shown below, Apple invested hundreds of millions of dollars to

23  establish the domestic fame of the APP STORE mark—long before Amazon began its

24  commercial use of that mark.  Amazon's use of APPSTORE will blur the association between the

25  APP STORE mark and Apple; moreover, Amazon's use threatens to tarnish the reputation of the

26  APP STORE service—Apple will be harmed if Amazon does not provide service and ease of use

27  equivalent to Apple's.  And Amazon is already taking risks with its service that are likely to cause

28  consumer dissatisfaction.

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1   When Apple learned that Amazon intended to launch its mobile software download

2   service under the APPSTORE name, Apple contacted Amazon on multiple occasions to seek

3   assurances that Amazon would avoid use of Apple's mark.  Amazon ignored these

4   communications, opting not to respond at all until after Apple brought this action and only after

5   Amazon had launched its competing APPSTORE service. Amazon launched its APPSTORE

6   service with full knowledge of Apple's objection.

7   As set forth in detail below, Apple has a strong likelihood of success on the merits with

8   respect to its claims for trademark infringement and dilution, Apple is likely to suffer irreparable

9   harm, the balance of hardships weighs decidedly in Apple's favor, and an injunction is in the public's

10   interest to avoid confusion.  The Court should promptly enjoin Amazon's misuse of Apple's mark.

11   **II.**      **STATEMENT OF FACTS**

12          **A.      Apple Launches A Unique Service**

13   On March 6, 2008, Apple announced that it would launch the APP STORE service and on

14   July 11, 2008, that service became operational.  *See* Declaration of Thomas La Perle, Esq. ("La

15   Perle Dec.") ¶ 4; Declaration of Matthew Fischer ("Fischer Dec.") ¶ 3.  From its inception, the

16   APP STORE service was fundamentally different from existing mobile software download

17   services in terms of the source of the service, the ease of use, and the breadth and number of

18   offerings.  Fischer Dec. ¶¶ 4-6, 10.  As a columnist for *The New York Times* remarked soon after

19   the launch of the service, "[n]othing like the App Store has ever been attempted before."  La Perle

20   Dec. ¶ 5, Ex. 1.  As a result, Apple's APP STORE service achieved a level of acceptance and

21   fame that far eclipses any preexisting service.

22          Before the APP STORE service, almost all download services were controlled by

23   operators of mobile telephone systems, and those services offered a much smaller and less diverse

24   assortment of mobile software—largely limited to ringtones, wallpapers, and games.  Fischer

25   Dec. ¶ 4.  Software developers instantly embraced the iPhone device's new mobile platform and

26   the chance to distribute their software directly to consumers through Apple's new APP STORE

27   service—100,000 developers downloaded the software development kit (SDK) within four days

28   of Apple making it available.  By June 9, 2008—a month before the APP STORE service's

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1   launch—developers had downloaded more than 250,000 copies of the SDK.  *Id.* ¶ 5.

2          From its launch, the APP STORE service offered over 500 programs in a broader diversity

3   of mobile software than had been available on mobile devices, including enterprise productivity

4   tools, location-based social networking software, medical applications, and games.  *Id.* ¶ 6.  The

5   APP STORE service unleashed unprecedented software development for mobile devices.  *Id.* ¶ 6.

6   There are currently more than 350,000 software programs in 20 different categories—including

7   gaming, business, educational, finance, news, sports, productivity, social networking, health,

8   reference, travel, and utility software—available on the APP STORE service.  *Id.* ¶ 10.

9          The APP STORE service offered revolutionary ease of use and security for consumers

10  who may not be technologically savvy.  Users of Apple's iPhone, iPod, and iPad mobile devices

11  may directly access the APP STORE service to browse for, license, and download mobile

12  software.  For example, if a user of an Apple mobile device wishes to obtain the popular "Angry

13  Birds" video game, she would touch the "App Store" labeled icon on her Apple mobile device to

14  access the APP STORE software that connects her to the service, search for the "Angry Birds"

15  program, and obtain a copy of that program on her device by licensing and downloading the

16  software through the APP STORE service.  *Id.* ¶ 7.  Users of computers running Apple's iTunes®

17  software may also browse for and license such software from their desktop computers and later

18  load the software onto the users' mobile devices.  *Id.* ¶ 8.

19         Starting before the APP STORE service's launch and continuing to today, Apple has

20  taken rigorous steps to seek to ensure that software available from the service does not include

21  inappropriate content, viruses, or malware.  Apple has invested in these screening measures

22  because it views them as essential to building and maintaining a public reputation for providing a

23  service that offers safe, secure software that protects the integrity, performance, and stability of

24  users' mobile devices.  *Id.* at ¶ 12.

25         Apple's APP STORE service immediately caught on with consumers—consumers

26  downloaded more than 100 million programs in the first two months after launch.  Consumers

27  have now downloaded software programs more than 10 billion times, and more than 160 million

28  devices may access the service worldwide.  *Id.* ¶¶ 6, 9-10.  Tens of millions of APP STORE

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1  service consumers are in the United States.  *Id.*

2  **B.   Apple Chooses And Promotes A Unique Mark: APP STORE**

3  To evoke the new and unique nature of its then-upcoming service, Apple coined a new

4  and unique term: APP STORE.  APP STORE was not in general use before Apple announced the

5  name of the service on March 6, 2008.  Declaration of Robert A. Leonard, Ph.D. ("Leonard

6  Dec.") ¶ 26.  And none of the existing services for mobile software downloads used branding

7  similar to APP STORE.  For example, Verizon called its service the "Get It Now virtual store"

8  and later changed the name to the "Verizon Media Store."  La Perle Dec. ¶ 12.

9  Apple has made massive investments in advertising and promoting the APP STORE

10  service and the APP STORE mark—spending hundreds of millions of dollars on print, television,

11  and internet advertising in the United States alone.  Fischer Dec. ¶ 13.  Apple has prominently

12  featured the mark in print advertising sponsored both by Apple and by AT&T (which offers

13  wireless connectivity for certain of Apple's mobile devices).  These ads have appeared in such

14  magazines and newspapers as *Fortune*, *The New Yorker*, *The Economist*, *Newsweek*, *Time*, *The*

15  *New York Times*, *The Washington Post*, and *The Wall Street Journal*, as well as numerous other

16  regional and local newspapers.  *See id.* ¶ 13, Ex. 2.

17  Apple also has conducted numerous television advertising campaigns promoting the APP

18  STORE service, including commercials highlighting the large variety of mobile software

19  programs available through the APP STORE service.  *Id.* ¶ 14.  Most recently, Apple aired

20  nationwide television commercials that state "If you don't have an iPhone - you don't have the

21  App Store."  *Id.*  These commercials refer to the APP STORE mark and also depict the APP

22  STORE mark used in connection with mobile software available through the service.  *Id.*  Apple

23  has aired these and other commercials regarding its APP STORE service on all the major

24  television broadcast stations, including ABC, CBS, NBC, FOX, The CW, BET, Comedy Central,

25  CNN, ESPN, MTV, TBS, TNT, and VH1.  *Id.*  As a result, millions of consumers have been

26  exposed to Apple's television campaigns.  *Id.*

27  The APP STORE service also has been the subject of an overwhelming amount of high-

28  profile positive unsolicited media coverage.  These articles frequently recognize the APP STORE

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1   mark as referring to Apple's service.  *See id.* ¶ 20, Ex. 9.

2         Apple's efforts and the resulting commercial success of the APP STORE service have

3   conditioned a majority of consumers in the United States to perceive APP STORE as a trademark.

4   *See* Leonard Dec. ¶¶ 29-32, 41.  In addition, Apple has obtained registrations for the APP STORE

5   mark covering over 50 foreign jurisdictions.  *See* La Perle Dec. ¶ 10, Ex. 5.  Apple applied to

6   register the APP STORE mark in the United States.  In January  2010, the Patent and Trademark

7   Office concluded that Apple was entitled to claim trademark rights in APP STORE and approved

8   Apple's application for publication.  In July 2010, Microsoft Corporation filed an opposition to

9   that application.  *Id.* ¶ 11; *see also* TTAB Proceeding No. 91195582.  That opposition is pending

10  before the Trademark Trial and Appeal Board, and no decision has been issued.

11         **C.      Apple Vigorously Protects Its APP STORE Mark**

12        The phenomenal popularity of the APP STORE service has prompted a number of

13  competitors to offer their own mobile software download services.  Mobile hardware and

14  software manufacturers—Microsoft, Google, Nokia, Samsung, Research in Motion (RIM)—

15  along with mobile telecommunications service providers now offer mobile software download

16  services that compete with Apple's.  La Perle Dec. ¶ 12.  These competitors—including

17  Microsoft, which terms its service MARKETPLACE—are able to brand and describe their own

18  mobile software download services without using the term APP STORE.  *Id.*

19        In limited instances, third parties have made improper use of the term APP STORE.

20  *Id.* ¶ 13.  In response, Apple has contacted those parties and requested that they cease and desist

21  from further improper use of the mark.  *Id.*  In most instances, the entities contacted by Apple

22  agreed to comply with Apple's requests, although a minority have recently refused to do so, citing

23  Microsoft's opposition to Apple's registration.  *Id.* ¶ 14.

24         **D.      Amazon's Misuse Of Apple's APP STORE Mark**

25        In approximately January 2011, Amazon began soliciting software developers to

26  participate in a future mobile software download service to be offered by Amazon.  Amazon used

27  (and continues to use) the APPSTORE mark in connection with what Amazon terms the

28  "Amazon Appstore Developer Portal" and the "Amazon Appstore Developer Program."  At no

                                                    APPLE INC.'S NOTICE OF MOTION AND
                              - 6 -                      MOTION FOR PRELIMINARY
                                                    INJUNCTION; CASE NO. CV 11-01327 PJH

1  time has Amazon received a license or authorization from Apple to use the APP STORE mark.

2  *Id.* ¶ 17.

3       Upon learning of Amazon's misuse of Apple's mark, Apple contacted Amazon on or

4  about January 19, 2011, to demand that Amazon cease its use of the APP STORE mark.  Apple

5  followed up with additional efforts to contact Amazon on or about February 4, March 14, and

6  March 21, 2011.  Amazon did not provide a substantive response to any of Apple's

7  communications until after launching Amazon's APPSTORE service on March 22, 2011.  *Id.*;

8  Declaration of David R. Eberhart ("Eberhart Dec.") ¶¶ 3-6.

9       Despite Apple's multiple communications to Amazon informing them of Apple's rights,

10  Amazon launched its infringing APPSTORE service on March 22, 2011.  Amazon's service

11  purports to make available nearly 4,000 mobile software applications, many of which are the

12  same titles as some of the most popular applications available on Apple's APP STORE service.

13  Fischer Dec. ¶ 24.  The following are three representative samples of Amazon's use of the

14  APPSTORE mark, as obtained from Amazon's website between March 23 and April 12, 2011:



26  As discussed below, Amazon's use of Apple's mark and its operation of the Amazon APPSTORE

27  service will cause consumer confusion and dilute Apple's mark in numerous ways.

1

### III.   ARGUMENT

2          Apple is entitled to a preliminary injunction if it establishes that it is likely to succeed on

3   the merits, it is likely to suffer irreparable harm in the absence of preliminary relief, the balance

4   of equities tips in its favor, and an injunction is in the public interest.  *See Winter v. Natural Res.*

5   *Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008); *see also GoTo.com, Inc. v. Walt*

6   *Disney Co.*, 202 F.3d 1199, 1204-05 (9th Cir. 2000).  In this circuit, it is presumed that a

7   trademark plaintiff will suffer irreparable harm on a showing of likelihood of confusion.

8   *GoTo.com, Inc.*, 202 F.3d at 1205 n.4; *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824,

9   830 (9th Cir. 1997).[1]  Apple's infringement and dilution claims provide two independently

10  sufficient bases for an injunction.

11         **A.      Apple Is Likely To Succeed On The Merits Of Its Infringement Claim**

12         To prove trademark infringement, Apple must show ownership of a legally protectable

13  mark and a likelihood of confusion arising from Amazon's use.  *Applied Info. Scis. Corp. v. eBay,*

14  *Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).  Apple amply makes these showings.

15                 **1.      Apple Owns And May Protect The APP STORE Mark**

16                         **a.      APP STORE Is Suggestive And Inherently Distinctive**

17         A suggestive mark is one for which "a consumer must use imagination or any type of

18  multistage reasoning to understand the mark's significance … the mark does not describe the

19  product's features, but suggests them."  *Zobmondo Entm't LLC v. Falls Media, LLC,* 602 F.3d

20  1108, 1114 (9th Cir. 2010).  The primary criterion for evaluating whether a mark is suggestive is

21  whether it "requires a mental leap from the mark to the product." *Fortune Dynamic, Inc. v.*

22  *Victoria's Secret Stores Brand Mgmt., Inc.,* 618 F.3d 1025, 1033 (9th Cir. 2010).  APP STORE is

23  suggestive because its meaning is not inherently obvious, although Apple has devoted substantial

24  resources educating consumers about the service.  *See, e.g., The Money Store v. HarrisCorp Fin.,*

25  *Inc.*, 689 F.2d 666, 668-69, 674 (7th Cir. 1982) (upholding district court's finding that THE

26

---

27  [1] Although this presumption has been criticized by district courts and commentators, it remains the law of this circuit.  *See, e.g., Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571

28  F.3d 873, 877 (9th Cir. 2009).  In any event, Apple will suffer irreparable injury without a preliminary injunction, as shown below.

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1  MONEY STORE is suggestive rather than descriptive and stating "[s]ome imagination and

2  perception are . . . required to identify the precise nature of the services offered by the plaintiff.").

3  Similar to THE MONEY STORE mark, Apple used the traditional bricks-and-mortar term "store"

4  in a new context—an innovative online mobile software download service—and created a novel

5  coinage by combining it with the shorthand "app."

6         **b.      The APP STORE Mark, Even If Considered To Be Descriptive,
                 Has Acquired Secondary Meaning**

7

8         Even if the Court were to evaluate APP STORE as a descriptive mark, that mark would

9  still be protectable because it has acquired secondary meaning. *Lahoti v. VeriCheck, Inc.*, 586

10  F.3d 1190, 1197 (9th Cir. 2009).   Many descriptive marks have been found protectable, including

11  HONEY BAKED HAM, *see Schmidt v. Quigg,* 609 F. Supp. 227, 231 (D.C. Mich. 1985),

12  FINANCE EXPRESS, *see Fin. Exp. LLC v. Nowcom Corp.*, 564 F. Supp. 2d 1160, 1170 (C.D.

13  Cal. 2008), and CREDIT COUNSELING, *see Credit Counseling Ctrs. of Am., Inc. v. Budget &*

14  *Credit Counseling Servs., Inc.*, 1997 WL 115645, 3 (S.D.N.Y. 1997).  Secondary meaning is

15  established when "the primary significance of the term in the minds of the consuming public is

16  not the product but the producer."  *Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d

17  1001, 1015 (9th Cir. 1985) (citing *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938)).

18  Although the APP STORE mark currently is unregistered in the United States because Microsoft

19  has opposed that registration, "registration is not a prerequisite to suit." *Protectmarriage.com v.*

20  *Courage Campaign,* 680 F. Supp. 2d 1225, 1228 (E.D. Cal. 2010) (citing *Two Pesos v. Taco*

21  *Cabana*, 505 U.S. 763, 768 (1992)).

22         Courts consider a variety of factors to assess secondary meaning, including (1) whether

23  actual consumers of the service bearing the claimed trademark associate the trademark with the

24  producer; (2) the amount, nature, and geographical scope of advertising under the claimed

25  trademark; (3) the length and manner of its use; and (4) whether its use has been exclusive.

26  *Transgo*, 768 F.2d at 1015 (citing 1 Gilson, *Trademark Protection & Practice*, § 2.09[1]); *Japan*

27  *Telecom, Inc. v. Japan Telecom Am., Inc.,* 287 F.3d 866, 873 (9th Cir. 2002).  Apple need only

28  show there is a fair chance that it can prove secondary meaning to obtain a preliminary injunction.

1    *See Sierra On-Line v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422-23 (9th Cir. 1984). Apple's

2    proof far exceeds this low threshold.

3          First, the submitted expert testimony establishes that consumers associate the APP

4    STORE mark with Apple's mobile software download service. Leonard Dec. ¶ 23. Dr. Robert

5    Leonard is a linguistics expert who applied scientific methods to assess the public use of the term

6    APP STORE. Dr. Leonard concluded that "the predominant usage of the term APP STORE is as

7    a proper noun to refer to Apple's online application marketplace." *Id*. Dr. Leonard analyzed

8    several sources to assess usage of the term: a LexisNexis database of United States news stories,

9    The Corpus of Contemporary American English—a collection of over 410 million words from

10   popular American publications during the years 1990-2010—and results of Google searches.

11   Dr. Leonard's analysis revealed that 86%, 88%, and 76% of the references in these sources,

12   respectively, were to Apple's APP STORE service. *Id*. ¶¶ 25-33. Based on his analyses,

13   Dr. Leonard opines with "a high degree of certainty that the *predominant* usage of the term APP

14   STORE is as a proper noun to refer to Apple's online application marketplace." *Id*. ¶ 33

15   (emphasis added). Moreover, Amazon's own website uses the term APP STORE (omitting the

16   space between "App" and "Store") as a proper noun describing Apple's service. La Perle Dec.

17   ¶ 20, Ex. 10.

18         Second, Apple's massive advertising of the APP STORE service and use of the APP

19   STORE mark support a finding of secondary meaning. Apple has invested hundreds of millions

20   of dollars in promoting the APP STORE service to the public of the United States and has

21   consistently used the APP STORE mark to refer to Apple's mobile software download service.

22   Fischer Decl. ¶¶ 9-10; 13-21. Apple's widespread advertising and use have entrenched the mark

23   in consumers' minds as being associated solely with Apple. *See CytoSport,* 617 F. Supp. 2d at

24   1079-80.

25         Finally, Apple has been the substantially exclusive user of the APP STORE mark in

26   connection with a mobile software download service since March 6, 2008.[2] As Dr. Leonard

27   
28   _____
     [2] Salesforce.com, Inc. announced plans to brand a service with the APPSTORE mark and filed an
     intent-to-use trademark application for that mark. However, Salesforce never commenced
     offering the service under the APPSTORE mark and ultimately abandoned its trademark

1  opined, prior to Apple's introduction of its APP STORE service, the term "app store" was not in

2  general use in connection with the distribution of software.  Leonard Dec. ¶ 27; *see also Sengoku*

3  *Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996) (hallmark of ownership is first use of the

4  mark).  But since March 2008, the predominant usage of the term APP STORE is as a proper

5  noun to refer to Apple's service.  Leonard Dec. ¶¶ 23, 27, 33.

6      Apple is not required to provide direct evidence of secondary meaning to obtain a

7  preliminary injunction, because evidence of investment in advertising and promotion of product,

8  combined with evidence of success of product, is sufficient at the preliminary injunction stage.

9  *See CytoSport, Inc. v. Vital Pharms., Inc.,* 617 F. Supp. 2d 1051, 1079-80 (E.D. Cal. 2009), *aff'd*,

10  348 F. App'x 288 (9th Cir. 2009); *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822

11  (9th Cir. 1996).  Nonetheless, Apple has provided ample evidence of secondary meaning and, at

12  the very least, has shown that it has a substantial likelihood of proving secondary meaning.  The

13  PTO reached the same conclusion: after initially refusing the mark as descriptive, the Trademark

14  Office Examining Attorney accepted Apple's substantial evidence that the APP STORE mark had

15  acquired distinctiveness pursuant to 15 U.S.C. § 1052(f) and was therefore available for Apple's

16  exclusive use and registration.  *See* PTO Notation of Publication & Issue Review Complete,

17  Trademark Application Serial No. 77/525,433, Dec. 3, 2009.

18                  **c.      APP STORE Is Not A Generic Term**

19      Taking a cue from Microsoft's opposition to Apple's registration of the mark, Amazon

20  may claim that the APP STORE mark is generic.  Such a claim would be misplaced.  Generic

21  terms are common names that the substantial majority of the relevant public understands

22  primarily as describing the genus of goods or services at issue.  *In re Dial-A-Mattress Operating*

23  *Corp.*, 240 F.3d 1341, 1344 (Fed. Cir. 2001); 15 U.S.C. § 1064(3).  Here, however, there is ample

24  evidence that APP STORE is not primarily understood to mean the genus of services.  *See*

25  Leonard Dec. ¶¶ 23, 27, 33.  Moreover, Apple's principal competitors have all found terms other

26  than APP STORE to describe their services within the relevant genus.  La Perle Dec. ¶ 12.

27
28  application. La Perle Dec. ¶¶ 15-16.  Apple has objected to all third parties' uses of which it has
   become aware.  *Id.* ¶ 13. In fact, in response to Apple's demands, the majority of such third
   parties have agreed to stop using APP STORE improperly.  *Id.* ¶ 14.

APPLE INC.'S NOTICE OF MOTION AND
                                            MOTION FOR PRELIMINARY
                                            INJUNCTION; CASE NO. CV 11-01327 PJH

1    Indeed, even Amazon refers to its competitors as providing "marketplaces" rather than "app

2    stores." *Id.*, Ex. 6. Such usages provide evidence that the term is not generic—genericness does

3    not arise until a trademark has become the exclusive descriptor of the product such that

4    competitors cannot compete effectively without using the name to designate the product. *Ty Inc.*

5    *v. Softbelly's Inc.*, 353 F.3d 528, 531 (7th Cir. 2003).

6         Nor may Amazon dissect the mark into "APP" and "STORE" to show genericness. A

7    mark must be examined as a whole, rather than as constituent parts, to determine whether it is

8    generic. *See Cal. Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451 (9th Cir. 1985). As

9    Dr. Leonard explains, this approach is also sound as a matter of linguistics: human beings

10   interpret terms such as APP STORE as a whole rather than as independent parts. Leonard Dec.

11   ¶ 20.

12        As additional proof that APP STORE is not generic, Dr. Leonard found no traditional

13   dictionaries defining the term APP STORE. *Id.* ¶ 36. When he searched non-traditional

14   dictionaries, Dr. Leonard discovered that the vast majority defined APP STORE as referencing

15   Apple's mobile software download service. *Id.* ¶ 41. These facts support a finding of non-

16   genericness. For example, a genericness challenge to the term THUMBDRIVE for portable

17   storage devices was rejected in part because "the record show[ed] that the more mainstream

18   reference works (*e.g.*, Merriam-Webster Online []) do not have a listing for THUMBDRIVE."

19   *See In re Trek 2000*, 97 U.S.P.Q.2d 1106, 1112 (2010). Similarly, the term DOOR SYSTEMS

20   was found not-generic because it did not appear in a dictionary and the fact that its component

21   words did "cannot count for much; otherwise it could be argued that 'Seven-Up' is generic, which

22   no one believes." *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996).

23              **2.     Amazon's Use Is Likely to Confuse Consumers**

24        Because the services at issue are marketed and delivered via the internet, three *Sleekcraft*

25   factors take primacy over the others: (1) similarity of the marks; (2) relatedness of the services;

26   and (3) simultaneous use of the Web as a marketing channel. *See Interstellar Starship Servs.,*

27   *Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 1999). "When this 'controlling troika,' or internet

28   trinity, 'suggests confusion is ... likely,' the other factors must 'weigh strongly' against a

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1   likelihood of confusion to avoid the finding of infringement."  *See id.* (internal citations omitted).[3]

2          Here, the "internet trinity" factors strongly establish a likelihood of confusion.  And the

3   remaining *Sleekcraft* factors—strength of the mark; evidence of actual confusion; the degree of

4   care likely to be exercised by the purchaser; defendant's intent in selecting the mark; and

5   likelihood of expansion, *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)—

6   provide further compelling proof of likelihood of confusion.

7                  a.      **Internet Trinity Factor 1: The Parties' Marks Are Virtually
                           Identical**

8

9          Amazon's purported APPSTORE mark is virtually identical to Apple's APP STORE

10  mark.  Both marks contain the terms "app" and "store" used in the same order.  The only

11  difference between the two marks is the absence of a space in Amazon's use.  Such a *de minimis*

12  distinction is legally irrelevant.  *See Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.*, 174

13  F.3d 1036, 1056 (9th Cir. 1999) (finding likelihood of confusion between "MovieBuff" and

14  "moviebuff.com"); *see also Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1131

15  (9th Cir. 1998) (holding "DreamWorks" and "Dreamwerks" similar).  In fact, Amazon omits the

16  space on its own website when using the APP STORE mark to describe *Apple's* service.  La Perle

17  Dec. ¶ 20, Ex. 10.  Moreover, when spoken, the marks sound exactly the same—making

18  confusion even more likely.  *See, e.g.*, *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp.

19  1189, 1197 (E.D.N.Y. 1983) (use of exclamation point is of "no great significance" because it is

20  "unlikely to be noticed by many consumers" and "undetectable" when the two marks are spoken).

21          Nor should Amazon be heard to claim it has dispelled confusion by using the AMAZON

22  house mark in connection with Apple's APP STORE mark.  Such claims have been considered a

23  "smoke screen and a poor excuse for the defendants' blatant misappropriation of the plaintiff's

24  _____

25  [3] The Ninth Circuit's decision earlier this year in *Network Automation v. Advanced Systems Concepts, Inc.*, __ F.3d __, 2011 WL 815806 (9th Cir. Mar. 8, 2011) emphasized that courts should not apply "excessive rigidity" when applying the *Sleekcraft* factors in the internet context.

26  The panel suggested the internet "trinity" should not be given undue weight in the context of keyword internet advertising, but endorsed that trinity in cases involving internet domain names.

27  *Network Automation*, 2011 WL 815806, at *13.  The marks at issue here—APP STORE and APPSTORE—are being used in ways analogous to domain names as a means to identify the

28  source of on online service.  In fact, Amazon uses for its service the subdomain www.amazon.com/appstore.  Fischer Dec. ¶ 23, Ex. 10.

name." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988).  Moreover, Amazon's use of its house mark may ***increase*** the likelihood of confusion because Amazon is widely known as a reseller of others' products: as Amazon's 10-K states, "[t]he products offered on our customer-facing websites primarily include merchandise and content we have purchased for resale from vendors *and [products] offered by third party sellers*." La Perle Decl. Ex. 8, p. 19 (emphasis added).  And Amazon is an authorized reseller of certain Apple products—although not the Apple products available through the APP STORE service.  La Perle Dec. ¶ 18.  As one court noted in such a situation, "a purchaser could well think plaintiff had licensed defendant as a second user and the addition [of a housemark] is thus 'an aggravation, and not a justification.'"  *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972).

### b.     Internet Trinity Factor 2: The Parties' Services Are Related

The parties' services are closely related.  Amazon purports to offer a service where consumers may download software for handheld devices, the same service Apple offers.  When services are used by the same class of purchasers—here, consumers of inexpensive software for use on mobile devices—the likelihood of confusion is higher.  *See AMF*, 599 F.2d at 350.

Although the two services currently sell products for use on devices that employ different mobile operating systems (Apple for the iOS operating system and Amazon for the Android operating system), confusion is still likely for three important reasons.  First, both Amazon and Apple are offering downloadable software generally, and the same or similar *type* of software (*i.e.* games, business applications, etc.) specifically.  Where companies offer services that relate to the same general industry—here, downloadable software for mobile devices—actionable "initial interest" confusion may arise even if no sales are consummated.  *Brookfield*, 174 F.3d at 1056, 1062-63.  Second, Amazon is primarily known as a ***reseller***—with the exception of the Kindle device, Amazon's near-exclusive role is to resell goods and services of other entities and persons (including Apple).  La Perle Dec. ¶ 18, Ex. 8.  Thus, members of the public who encounter Amazon's APPSTORE mark are likely to be confused and conclude that Amazon is now a reseller of content available through Apple's APP STORE service.  Third, Amazon's mobile

1    software download service offers many of the same software titles Apple's APP STORE service

2    offers.  A review of the software offered by Amazon reveals that many of the titles are also

3    offered on Apple's APP STORE service—increasing the likelihood that a consumer looking for a

4    software title at Apple's APP STORE service will be confused and reach Amazon's APPSTORE

5    service instead.  Fischer Dec. ¶ 25.

6                        **c.       Internet Trinity Factor 3: The Parties' Market Their Services
                                  Through The Same Channels**
7

8         "Convergent marketing channels increase the likelihood of confusion."  *AMF*, 599 F.2d at

9    353 (citations omitted).  Apple and Amazon both market their mobile software download services

10   to mobile software consumers through the internet.  Fischer Decl. ¶¶ 15-17; La Perle Decl. ¶ 21.

11   To Apple's knowledge, Amazon does not use any other marketing channel.  La Perle Decl. ¶ 21.

12   When consumers are browsing the internet, they are likely to be faced with advertisements for

13   both Apple's APP STORE service and Amazon's new, competing service.  Under these

14   circumstances, consumer confusion is likely: "the Web, as a marketing channel, is particularly

15   susceptible to a likelihood of confusion, since . . . it allows for competing marks to be

16   encountered at the same time, on the same screen."  *GoTo.com*, 202 F.3d at 1207.

17                       **d.       Other *Sleekcraft* Factors**

18        ***Apple's APP STORE mark is strong.***  The strength of a trademark is "evaluated in terms

19   of its conceptual strength and commercial strength."  *GoTo.com*, 202 F.3d at 1207 (citations

20   omitted).  Although suggestive and descriptive marks are not conceptually strongest, the

21   commercial strength of Apple's mark is substantial.  As discussed more fully *supra* at Section

22   II.A., Apple has spent hundreds of millions of dollars on print, television, and internet advertising

23   for its mark.  *See also* Fischer Dec. ¶¶ 9-10, 13-22.  Apple's advertising efforts and the

24   commercial success of the APP STORE service have resulted in substantial public association

25   between the mark and Apple as the source of the service, as established by Dr. Leonard's

26   testimony.  These facts render Apple's mark strong.  *Brookfield*, 174 F.3d at 1058 (citations

27   omitted).  In any event, this *Sleekcraft* factor is of "diminished importance" where, as here, the

28   services involved are closely related and the marks are nearly identical.  *See id.* at 1058-59.

1    ***Apple need not show actual consumer confusion.***  Amazon only recently launched its

2    APPSTORE service.  As a result, it is not feasible for Apple to obtain substantial evidence of

3    actual confusion.  But as this Court has stated, "because actual confusion may be difficult to

4    prove, the absence of such evidence is generally not noteworthy."  *Vertos Med., Inc. v. Globus*

5    *Med., Inc.*, No. 09-1411 PJH, 2009 WL 3740709, at *7 (N.D. Cal. Nov. 6, 2009); *see also*

6    *Fortune Dynamic,* 618 F.3d at 1035.  Moreover, courts routinely issue injunctions without

7    evidence of actual confusion.  *See, e.g. Golden Door, Inc. v. Odisho*, 646 F.2d 347, 351-52 (9th

8    Cir. 1980); *Dr. Seuss Enters., LP v. Penguin Books USA, Inc.*, 109 F. 3d 1394, 1405-06 (9th Cir.

9    1997).  In any event, postings on Amazon's website provide some evidence of confusion.  *See*

10   Fischer Dec. ¶ 28 ("When I first saw it on the Amazon page I thought it had an affiliation with the

11   Apple App Store….").

12       ***Consumers do not exercise significant care.***  Both services are accessible over the

13   internet, and consumers deciding which service to use may explore their options over the internet.

14   The Ninth Circuit has counseled that consumers are unlikely to exercise significant care when

15   navigating the internet, finding that "navigating amongst web sites involves practically no effort

16   whatsoever, and arguments that Web users exercise a great deal of care before clicking on

17   hyperlinks are unconvincing."  *GoTo.com*, 202 F.3d at 1209.  Moreover, as discussed above, the

18   success of Apple's APP STORE is due in part to the ease with which consumers may find,

19   license, download, and install mobile software.  Fischer Dec. ¶ 6.  Amazon is also seeking to

20   attract consumers based on the claimed ease of use of its service, thus Amazon's service may

21   appeal to less technologically savvy users.  *Id.* ¶ 23, Ex. 10.  Additionally, the software that

22   consumers may license from Apple's APP STORE service or Amazon's APPSTORE service is

23   often free or available at a very low price—generally $5.00 or less.  *Id.* ¶ 24.  Purchasers exercise

24   reduced care in shopping for inexpensive products, which increases the likelihood of confusion.

25   *See Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1214 (C.D. Cal. 1998).

26       ***Amazon's actual knowledge and disregard of Apple's rights constitutes an intent to***

27   ***infringe.***  The evidence of Amazon's intentional misuse of Apple's mark is overwhelming.

28   Amazon deliberately used that mark in the launch of Amazon's APPSTORE service on March 22,

- 16 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

2011 after Apple repeatedly notified Amazon of Apple's rights.  Apple expressed its objections on four occasions prior to Amazon's launch.  La Perle Dec. ¶ 17; Eberhart Dec. ¶¶ 3-6.  Amazon did not substantively respond to Apple's communications until after the launch.  *Id.*  Amazon's intentional and willful disregard of Apple's rights is unambiguous and "[a]dopting a designation with knowledge of its trademark status permits a presumption of intent to deceive."  *Interstellar Starship Servs. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999).

*Amazon's potential for expanded use of the mark is strong.*  A "'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing."  *AMF*, 599 F.2d at 354 (citations omitted).  Here, the possibility has been realized.  Amazon is already competing directly with Apple's mobile software download service: both companies are offering software downloads for mobile devices.  Although Amazon's downloads will not work on Apple's iOS-based devices, Amazon and Apple compete for customers who are considering software download services before purchasing a mobile device.  It is also possible that Amazon will expand its business to sell or resell mobile software downloads for other operating systems.  An Amazon spokeswoman stated "it wouldn't surprise [her]" for Amazon's APPSTORE to expand beyond Android devices into other ecosystems, which would potentially include Apple's iOS-based devices.  La Perle Dec. ¶ 19, Ex. 9.

In sum, consideration of the relevant factors amply demonstrates that Apple is likely to succeed in establishing a likelihood of consumer confusion.

**B.**     **Apple Is Likely To Succeed On The Merits of Its Dilution Claim**

Independent of its right to injunctive relief for infringement, Apple is entitled to relief for Amazon's dilution of Apple's APP STORE mark.[4]  Under the federal dilution statute, as amended in 2006, Apple is entitled to injunctive relief if it can establish that (1) its APP STORE mark is famous; (2) Amazon is making commercial use of the mark; (3) Amazon's use of the mark began

---

[4] Although either infringement or dilution constitute independent grounds for granting a preliminary injunction, "both infringement by a likelihood of confusion and dilution can coexist as legal findings" where "a significant number of customers are likely to be confused *and* … among a significant number of other customers who are not confused, the defendant's use will illegally dilute by blurring or tarnishment."  4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 24:72.

1   after the APP STORE name became famous; and (4) Amazon's use presents a likelihood of

2   dilution of the distinctive value of the mark.  *PerfumeBay.com v. eBay, Inc.,* 506 F.3d 1165, 1180

3   (9th Cir. 2007); 15 U.S.C. § 1125(c); *see also Nike, Inc. v. NikePal Int'l, Inc.*, No. 05-1468, 2007

4   WL 2782030, at *5 (E.D. Cal. Sept. 18, 2007).  Neither likelihood of confusion nor competition

5   between Apple and Amazon are necessary to prevail on a dilution claim.  *See PerfumeBay.com*,

6   506 F.3d at 1182 n.11.  Apple is likely to succeed on its dilution claim.

### 1.      Apple's APP STORE Mark Is Famous

8          "A mark is famous if it is widely recognized by the general consuming public of the

9   United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C.

10   § 1125(c)(2)(A).  Factors to be considered include:  (1) the duration, extent, and geographic reach

11   of advertising and publicity of the mark, whether advertised or publicized by the owner or third

12   parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under

13   the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is registered.

14   *Id.*  Courts have found marks to be famous under the amended federal dilution statute due to

15   national brand prominence, the degree of consumer recognition of the marks, significant

16   advertising and brand promotion, and overall product sales.  *See Nike*, 2007 WL 2782030, at *5-

17   6; *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 529 F. Supp. 2d 1215, 1244-45 (D. Or. 2007).

18          The Ninth Circuit determined that the mark HOT WHEELS could be found famous where

19   it had been in use for over 37 years, $350 million had been spent advertising the mark over its

20   lifetime, 3 billion Hot Wheels units had been sold since the inception of the mark, and Hot

21   Wheels were sold in all fifty states and throughout the world.  *Jada Toys, Inc. v. Mattel, Inc.,* 518

22   F.3d 628, 635 (9th Cir. 2008).  Similarly, a district court found the mark HOTMAIL likely to be

23   famous (and granted a preliminary injunction against the defendant) where the plaintiff had been

24   using the mark in commerce for two years, had spent approximately $10 million marketing,

25   distributing and advertising its services nationally and internationally, and the mark was

26   distinctive.  *Hotmail Corp. v. Van$ Money Pie Inc.,* 47 U.S.P.Q. 2d 1020, 1021, 1024 (N.D. Cal.

27   1998).   Applying these standards, Apple's APP STORE mark is famous.

28          Apple has used the APP STORE mark for over three years, the mark has been exposed to

- 18 -

the owners of more than 160 million Apple mobile devices worldwide, and consumers have

downloaded software applications more than 10 billion times, Fischer Dec. ¶¶ 9-10; it has been

the subject of extensive advertisements across the United States with hundreds of millions of

dollars spent on advertising to date, *id.* ¶¶ 13-22; it has garnered significant web presence and

unsolicited third-party publications discussing the brand, *id.* ¶ 20; it has a robust presence

throughout the United States and is available in 90 countries, *id.* ¶ 9; and Apple has obtained

registrations of the APP STORE mark covering over 50 foreign jurisdictions.  La Perle Dec. ¶ 10.

Apple's APP STORE mark is undoubtedly famous.

### 2.     Amazon Is Making Commercial Use Of The Mark

It is beyond dispute that Amazon is making commercial use of the mark by designating its

mobile download service by the name APPSTORE and by marketing and selling mobile software

downloads through that service throughout the United States.

### 3.     Amazon's Use Began After The Mark Became Famous

Amazon began its use of APPSTORE long after Apple had established the fame of its

APP STORE mark.  By the time Amazon first announced its APPSTORE developer portal in

January 2011, Apple had spent hundreds of millions of dollars advertising the mark in the United

States, Apple had sold to United States consumers tens of millions of mobile devices compatible

with the APP STORE service, and tens of millions of United States customers had licensed and

downloaded software from the APP STORE service.  Fischer Dec. ¶¶ 9, 10, 13.

### 4.     Amazon's Use of APPSTORE Will Dilute Apple's Mark

Apple may prevail on its dilution claim by showing either that Amazon's use will blur the

distinctiveness of Apple's mark or that Amazon's use will tarnish Apple's mark.  Although only

one is required for relief, both forms of dilution are present here.

#### a.     Amazon's Use Blurs The Distinctiveness Of Apple's Mark

Under the amended federal statute, dilution by blurring arises from association of the

"similarity between a mark or trade name and a famous mark that impairs the distinctiveness of

the famous mark." 15 U.S.C. § 1125(c)(2)(B).  Dilution occurs "when a mark previously

associated with one product also becomes associated with a second." *Visa Int'l Serv. Ass'n v. JSL*

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1  *Corp.,* 610 F.3d 1088, 1090 (9th Cir. 2010). The statute identifies six factors relevant to the

2  question of blurring: (1) similarity of the marks; (2) distinctiveness of the famous mark;

3  (3) substantially exclusive use; (4) degree of recognition; (5) intent to create association; and

4  (6) actual association between the marks. 15 U.S.C. § 1125(c)(2)(B). Five factors weigh in favor

5  of Apple, and the last factor is neutral.

6    **The marks are effectively identical.** The law does not require that the marks be identical

7  or nearly identical to establish dilution. *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,*

8  __ F.3d __, No. 09-16322, 2011 WL 383972, at *13 (9th Cir. Feb. 8, 2011). Nonetheless,

9  Amazon's APPSTORE mark is virtually identical to Apple's APP STORE mark, with the only

10  difference between them being the absence of a space between the two words when used by

11  Amazon. The Ninth Circuit has held that a trier of fact could find that marks as different as HOT

12  WHEELS and HOT RIGZ were "quite similar" for purposes of dilution. *Jada Toys,* 518 F.3d at

13  636. The Ninth Circuit also found that the marks VISA and EVISA were "effectively identical,"

14  regardless of the defendant's addition of the letter "e" as a prefix. *Visa Int'l Serv. Ass'n,* 610 F.3d

15  at 1090. Amazon's subtraction of a single space is a trivial difference and does not mitigate the

16  fact that the two marks are essentially the same.

17    **Apple's mark has acquired distinctiveness**. As discussed above in Section III.A.1.,

18  Apple's mark has acquired distinctiveness.

19    **Apple's use has been substantially exclusive**. As discussed above at Section III.A.1.b.,

20  "app store" was not a term in common use before Apple introduced its APP STORE service three

21  years ago, and since that time Apple has enjoyed the substantially exclusive use of the APP

22  STORE mark. Leonard Dec. ¶¶ 25-26. Thus, this factor weighs in Apple's favor.

23    **The degree of recognition favors Apple**. Apple's mark enjoys widespread recognition,

24  not only among its customers, but even non-customers. As Professor Leonard's evidence shows,

25  "the predominant usage of the term APP STORE is as a proper noun to refer to Apple's online

26  application marketplace." Leonard Dec. ¶ 23. This factor weighs in Apple's favor.

27    **Amazon intends to create association with Apple's mark**. As described above, it is clear

28  that Amazon opted to launch its competing service using Apple's mark even after being informed

1  of Apple's existing rights.  Amazon cannot credibly contend accident or mistake in naming its

2  competing service, and thus this factor also weighs in Apple's favor.

3        ***It is premature to find evidence of actual association.***  As discussed in the context of

4  actual confusion evidence in Section III.A.2.d. above, it is premature for Apple to be able to

5  present evidence of actual association between the two marks because Amazon's service only

6  launched on March 22, 2011.  But such association is almost certain—in fact, at least one

7  Amazon customer has already posted a comment on Amazon's website (on a discussion board

8  about this lawsuit) describing her actual association:  "I think Apple has a case.  A big factor is

9  consumer's perception.  When I first saw it on the Amazon page I thought it had an affiliation

10  with the Apple App Store, it took me a moment to see that it was Android."  Fischer Dec. ¶ 28,

11  Ex. 12.  Another Amazon customer wrote on the same discussion board: "Anytime you hear the

12  words 'App Store' you think of Apple."  *Id.*

13        Amazon's use of APPSTORE places the APP STORE mark in the context of mobile

14  software download services for Android devices—a "new and different context[], thereby

15  weakening the mark's ability to bring to mind [Apple's] goods or services."  *Visa Int'l Serv.*

16  *Ass'n,* 610 F.3d at 1092.  The result is dilution by blurring.

17            **b.**     **Amazon's Use Will Tarnish Apple's Mark**

18        Dilution by tarnishment occurs when an "association arising from the similarity between a

19  mark or trade name and a famous mark … harms the reputation of the famous mark."  15

20  U.S.C.A. § 1125(c)(2)(C).  Apple has expended substantial effort to offer a service that is easy to

21  use and provides high-quality, safe software that will preserve the integrity and stability of its

22  customers' mobile devices.  The goodwill arising from Apple's efforts is associated with its APP

23  STORE mark.  Apple developed this reputation in part by creating and enforcing procedures to

24  screen software made available through the APP STORE service; that screening process seeks to

25  ensure that the APP STORE service does not include inappropriate content, viruses, or malware.

26  Fischer Dec. ¶¶ 11-12.

27        Amazon, on the other hand, offers software applications for Android-based mobile

28  devices.  Android-based software has been subject to highly-publicized viruses and malicious

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

code—including, in one instance, the infection of hundreds of thousands of Android mobile

devices with malicious code—which created significant device stability and data security issues

for Android device users.  Fischer Dec. ¶ 27.

Moreover, Amazon is enabling software to be downloaded through its APPSTORE

service that bypasses security safeguards, thereby increasing the risks that its customers' Android

devices will be subject to viruses and malware.  Amazon's site indicates that some applications

available from Amazon's service will not work unless the mobile device is "rooted."  Declaration

of John Wright ("Wright Dec.") ¶ 4.  "Rooting" means that the security features in the Android

operating system have been bypassed and that the user has the highest level of access—known as

"root" access—to the mobile device.  In turn, software running on such a device has the highest

level of access to the operating system without constraint by security features—which

substantially increases the damage that malware or a virus can wreak on a mobile device.  *Id.* ¶ 5.

Apple's APP STORE service, by contrast, does not offer applications for "rooted"—or, in the

equivalent language for iOS devices, "jailbroken"—iOS-based mobile devices.  *Id.*  One

commentator described Amazon's decision to license software that may require devices to be

rooted as a decision that "will lead to compromised phones" and "will lead to some unhappy

customers."  He went on to characterize Amazon's decision as "a very questionable position for a

mainstream retailer to put itself in."  *Id.* ¶ 6, Ex. C.

Dilution law is designed to prevent the "whittling away" of a trademark's value.  *Acad. of

Motion Picture Arts & Scis. v. Creative House Promotions,* 944 F.2d 1446, 1457 (9th Cir. 1991)

(construing the California antidilution statute).  There, the Ninth Circuit held that the plaintiff

could sustain a claim for antidilution to protect its "Oscar" statute from the sale of an award

similar in appearance:  "[i]f the Star Award looks cheap or shoddy, or is disseminated without

regard to the ultimate recipient, the Oscar's distinctive quality as a coveted symbol of excellence

… is threatened."  *Id.*, s*ee also Johnson & Johnson Consumer Co. v. Aini*, 540 F. Supp. 2d 374,

394-95 (E.D.N.Y. 2008) (inferior quality of defendants' goods tarnished plaintiff's marks); 15

U.S.C. § 1125(c)(2)(C).

Apple has taken particular care to prevent damage to its users' mobile devices by

1   screening out from its APP STORE service software that could harm the device or compromise a

2   user's data.  Amazon's offering of Android operating system-based software—and particularly

3   software that requires a "rooted" device that bypass all security safeguards—through its

4   APPSTORE service is likely to tarnish Apple's reputation for offering safe, virus-free software

5   under the same mark.

6           **C.      Apple Will Suffer Irreparable Harm If an Injunction Is Not Ordered**

7           In trademark infringement actions, Ninth Circuit law presumes irreparable harm once the

8   plaintiff has established a likelihood of confusion.  *GoTo.com*, 202 F.3d at 1209; *see also Vertos*

9   *Med.*, 2009 WL 3740709, at *11-12.  Even absent the presumption, irreparable injury to Apple

10  exists because Amazon's use will damage the association of the APP STORE mark with Apple

11  and the positive reputation and goodwill Apple has built in the APP STORE service.  *Apple*

12  *Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 526 (9th Cir. 1984).  These injuries cannot be

13  remedied by money damages.

14          As discussed above, Apple has expended substantial efforts to establish a public

15  association between the APP STORE mark and Apple.  *See supra* Section II.B.  Amazon's use of

16  its APPSTORE mark threatens to destroy that association—causing consumers to conclude

17  falsely that Amazon's service is associated with Apple or that the APP STORE mark is not

18  associated exclusively with Apple's service.

19          Moreover, Amazon's use of the APPSTORE mark places the goodwill and reputation

20  developed in the mark APP STORE by Apple at risk.  As discussed above, Apple has invested

21  heavily to build the APP STORE service's reputation for ease of use and high quality software.

22  *See supra* Section II.B.  If Amazon does not provide service and software of at least equivalent

23  quality, Apple's reputation and goodwill will be harmed because consumers will not easily

24  differentiate between the services and will associate them with one another.

25          **D.      The Balance of Hardships Strongly Favors Apple**

26          Because Apple has shown that it is likely to succeed on the merits and that it is likely to

27  suffer irreparable injury absent an injunction, it is not necessary for the Court to consider whether

28  the balance of hardships tips decidedly in favor of Apple.  *See GoTo.com*, 202 F.3d at 1209.

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1    Even if the Court were to separately consider the balance of hardships, however, Apple

2    will suffer the greater hardship as a result of Amazon's ongoing use of Apple's mark.  As

3    described above, Apple has invested hundreds of millions of dollars over three years to develop

4    the goodwill associated with its mark.  If Amazon continues to use Apple's mark, Apple will lose

5    its exclusivity of use of the APP STORE mark and will be irreparably injured, requiring Apple—

6    the senior user—to take remedial measures to prevent consumer confusion.  *See GoTo.com*, 202

7    F.3d at 1209; *Apple Computer*, 725 F.2d at 526.

8    In contrast, Amazon has no legitimate business interest to protect.  Amazon has just

9    recently launched its competing service using Apple's mark, after being warned against adopting

10    that mark.  Amazon has developed none of its own goodwill and has instead sought to trade on

11    Apple's goodwill by deliberately infringing Apple's mark.  "Where the only hardship that the

12    defendant will suffer is lost profits from an activity which has been shown likely to be infringing,

13    such an argument in defense merits little equitable consideration."  *Concrete Mach. Co. v. Classic*

14    *Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988) (internal quotations and citations

15    omitted).  Moreover, a knowing infringer cannot be permitted to construct its business around its

16    infringement.  *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir.

17    1983), *cert. dismissed*, 464 U.S. 1033 (1984) (internal citations omitted).  Amazon can change the

18    name of its service with little or no loss during the pendency of this suit.

19    ### E.    The Public Interest Favors an Injunction

20    The public interest also supports injunctive relief because such relief promotes the public

21    interest in clarity and protection of trademarks.  "An important factor in protecting trademarks is

22    to avoid consumer confusion, which is in the public interest."  *Caesars World, Inc. v. Milanian*,

23    247 F. Supp. 2d 1171, 1205 (D. Nev. 2003) ( (citations omitted), *see also Brookfield*, 174 F.3d at

24    1066.  As discussed above, consumers are being led to believe there is a relationship between

25    Apple and Amazon with respect to mobile software download services when, in reality, none

26    exists.  The public interest militates against allowing Amazon to continue to confuse consumers

27    in this fashion.

28

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; CASE NO. CV 11-01327 PJH

1

IV.     **CONCLUSION**

2          For the foregoing reasons, the Court should preliminarily enjoin Amazon, as well as any

3   related entity or person acting in concert with Amazon, from any use of the APP STORE mark or

4   any confusingly similar mark, including but not limited to APPSTORE, until trial or other

5   disposition of this action.

6   Dated: April 13, 2011                                O'MELVENY & MYERS LLP

7

8                                                        By    /s/ David R. Eberhart
                                                              _____
9                                                             David R. Eberhart
                                                        Attorneys for Plaintiff APPLE INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28