1    MARTIN R. GLICK (No. 40187)
     email: mglick@howardrice.com
2    CLARA J. SHIN (No. 214809)
     email: cshin@howardrice.com
3    SARAH J. GIVAN (No. 238301)
     email: sgivan@howardrice.com
4    HOWARD RICE NEMEROVSKI CANADY
             FALK & RABKIN
5    A Professional Corporation
     Three Embarcadero Center, 7th Floor
6    San Francisco, California  94111-4024
     Telephone:     415/434-1600
7    Facsimile:     415/677-6262

8    Attorneys for Defendants and Counter-Claimants
     AMAZON.COM, INC., a Delaware corporation, and
9    AMAZON DIGITAL SERVICES, INC., a Delaware
     corporation

10

11                   UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14   APPLE INC., a California corporation,        No. 11-cv-01327 PJH

15                  Plaintiff and Counter-        Action Filed: March 18, 2011
                    Defendant,
16                                                AMAZON.COM, INC. AND AMAZON
                                                  DIGITAL SERVICES, INC.'S OPPOSITION
17        v.                                      TO APPLE INC.'S MOTION FOR
                                                  PRELIMINARY INJUNCTION
18   AMAZON.COM, INC., a Delaware corporation,
     and AMAZON DIGITAL SERVICES, INC., a
18   Delaware corporation,

19

20                  Defendants and Counter-
                    Claimants.

21

22

23

24

25

26

27

28

HowardRice

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................ 1

STATEMENT OF FACTS ................................................................ 3

      A.    Evidence Of The Genericness Of "App Store". ........... 3

           1.    Dictionary Definitions Of "App", "Store", And "App Store". ........... 3

           2.    Apple's Generic Use Of "App" And "App Store". ........... 3

           3.    Generic Use Of "App Store" By The Media, Industry Press, And Competitors. ........... 4

           4.    Generic Use Of "App Store" By Consumers. ........... 6

      B.    Amazon Appstore For Android. ........... 7

ARGUMENT .................................................................................. 7

    I.    A PRELIMINARY INJUNCTION IS AN EXTRAORDINARY REMEDY. ........... 7

    II.    APPLE HAS FAILED TO DEMONSTRATE THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AT TRIAL. ........... 8

      A.    The Unregistered Term "App Store" Is Generic. ........... 8

           1.    The Ninth Circuit Test For Genericness Compels A Finding That The Term "App Store" Is Generic For A Store Featuring "Apps". ........... 9

               a.    Dictionary Definitions Demonstrate That "App Store" Is Generic. ........... 10

               b.    Apple Uses "App Store" Generically To Refer To Its Own And Its Competitors' App Stores. ........... 11

               c.    Usage In The Media, By Competitors, and Consumers Confirm That "App Store" Is Generic. ........... 11

               d.    Alleged Consumer Awareness Of Apple's App Store Cannot Negate Genericness. ........... 13

      B.    Even If "App Store" Is Not Generic, Apple Cannot Demonstrate Any Likelihood Of Confusion, Let Alone The Clear Sgowing Requested For Preliminary Relief. ........... 14

           1.    Smartphone Consumers Are Aware That There Is No Overlap In Goods. ........... 16

           2.    "App Store" Is Weak. ........... 17

# TABLE OF CONTENTS

**Page**

3. There Is No Evidence That Amazon Intended To Mislead Consumers. ... 18

4. The Marks As Encountered In The Marketplace Are Not Similar. ... 18

5. There Is No Evidence Of Actual Confusion. ... 19

6. The Parties' Use Of A Common Marketing Channel Is Irrelevant. ... 19

7. There Is No Likelihood Of Expansion. ... 19

C. Apple Cannot Demonstrate Any Likelihood Of Dilution, Let Alone The Clear Showing Required For Preliminary Relief. ... 19

1. "App Store" Is Not A Famous Mark. ... 20

2. There Is No Likelihood Of Dilution By Blurring. ... 21

3. There Is No Likelihood Of Dilution By Tarnishment. ... 22

4. Amazon's Use Of "App Store" In "Amazon Appstore For Android" Is A Fair Use. ... 23

III. APPLE HAS FAILED TO DEMONSTRATE THAT IT WOULD BE IRREPARABLY HARMED WITHOUT A PRELIMINARY INJUNCTION. ... 24

IV. A PRELIMINARY INJUNCTION WILL IRREPARABLY HARM AMAZON. ... 24

V. PUBLIC INTEREST WEIGHS AGAINST A PRELIMINARY INJUNCTION. ... 25

CONCLUSION ... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689 (2d Cir. 1972) ............ 18

*Advertise.com, Inc. v. AOL Adver., Inc.*, 616 F.3d 974 (9th Cir. 2010) ......... 8, 10, 13, 24

*Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137 (4th Cir. 2000) ........ 12

*America Online, Inc. v. AT&T Corp.*, 243 F.3d 812 (4th Cir. 2001) ........ 12, 13

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) ........ 15, 16, 17, 18

*Avery Dennison Corp. v. Sumpton*, 189 F.3d 868 (9th Cir. 1999) ........ 19, 20

*Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452 (S.D.N.Y 2007) ........ 21

*CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019 (N.D. Cal. 2008) ........ 11

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181
(C.D. Cal. 2007) ........ 12

*Cohn v. Petsmart*, Inc., 281 F.3d 837 (9th Cir. 2002) ........ 18

*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ........ 17

*Dymo Indus., Inc. v. TapePrinter, Inc.*, 326 F.2d 141 (9th Cir. 1964) ........ 14

*Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F. Supp. 1270
(S.D.N.Y. 1983) ........ 13

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002) ........ 25

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143
(9th Cir. 1999) ........ 8, 9, 10, 13

*Frehling Enter., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330 (11th Cir. 1999) ........ 10

*Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F. Supp. 340 (D.N.J. 1996) ........ 24

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) ........ 16

*Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117 (D. Mass. 1999), *aff'd*
232 F.3d 1 (1st Cir. 2000) ........ 21

*Henri's Food Prods. Co. v. Tasty Snacks, Inc.*, 817 F.2d 1303(7th Cir. 1987) ........ 8

*Hotmail Corp. v. Van$ Money Pie Inc.*, 47 U.S.P.Q. 2d 1020 (N.D. Cal. 1998) ........ 21

*In re 1800Mattress.com IP, LLC*, 586 F.3d 1359 (Fed. Cir. 2009) ........ 11

**TABLE OF AUTHORITIES**

**Page(s)**

*In re Hotels.com*, 573 F.3d 1300 (Fed. Cir. 2009) ..................... 12

*In re Jonathan Drew, Inc. dba Drew Estate*, Serial No. 78979742, 2009 WL
    5253035 (T.T.A.B. Dec. 31, 2009) ..................... 14

*In re The Computer Store, Inc.*, 211 U.S.P.Q. 72 (T.T.A.B. 1981) ..................... 10

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079
    (7th Cir. 1988) ..................... 18

*Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628 (9th Cir. 2008) ..................... 20

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866 (9th Cir. 2002) ..................... 8

*Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111 (1938) ..................... 13, 14, 25

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596
    (9th Cir. 2005) ..................... 8

*Loctite Corp. v. Nat'l Starch & Chem. Corp.*, 516 F. Supp. 190 (S.D.N.Y. 1981) ..................... 12

*Maxim Integrated Prods. v. Quintana*, 654 F. Supp. 2d 1024 (N.D. Cal. 2009) ..................... 7

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ..................... 7

*Microsoft Corp. v. Lindows.com, Inc.*, 64 U.S.P.Q. 2d (BNA) 1397 (W.D. Wash.
    2002) ..................... 14, 24

*Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2d Cir. 2000) ..................... 18

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 97 U.S.P.Q. 2d 2036
    (9th Cir. 2011) ..................... 2, 16, 17, 18, 19

*Network Automation, Inc. v. Hewlett-Packard Co.*, No. CV-08-4675 JFW (RZ),
    2009 WL 5908719 (C.D. Cal. Sept. 14, 2009) ..................... 11, 20, 21

*Packman v. Chicago Tribune Co.*, 267 F.3d 628 (7th Cir. 2001) ..................... 18

*Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535 (4th Cir. 2004) ..................... 11, 13

*S. S. Kresge Co. v. United Factory Outlet, Inc.* 598 F.2d 694 (1st Cir. 1979) ..................... 10

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ..................... 22, 23

*Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011
    (9th Cir. 1979) ..................... 8, 9, 13

*TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88 (2d Cir. 2001) ..................... 21

*The Money Store v. HarrisCorp Fin., Inc.*, 689 F.2d 666 (7th Cir. 1982) ..................... 9

**TABLE OF AUTHORITIES**

**Page(s)**

*Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788 (9th Cir. 1981)   22

*Toyota Motor Sales, USA, Inc. v. Tabari*, 610 F.3d 1171 (2010)   16, 17

*Toys "R" Us, Inc. v. Akkaoui*, No. C-96-3381 CW, 1996 WL 772709
   (N.D. Cal. Oct. 29, 1996)   22

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)   8

*Ty Inc. v. Perryman*, 306 F.3d 509 (7th Cir. 2002)   22

*Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132. 1137 (N.D. Cal. 2008)   21

*Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088 (9th Cir. 2010)   19, 21, 23

*Visa Int'l Serv. Ass'n v. JSL Corp.*, 590 F. Supp. 2d 1306, 1315 (D. Nev. 2008)   20

*Weeks Dye Works, Inc. v. Valdani, Inc.*, No. 92049174, 2010 WL 2104147
   (T.T.A.B. May 11, 2010)   12

*Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254 (N.D. Cal. 2003)   7

*Winter v. Natural Res. Defense Council*, 555 U.S. 7 (2008)   7, 8

**Statutes**

15 U.S.C.
   §1125(c)(1)   19
   §1125(c)(2)(A)   20
   §1125(c)(3)   19
   §1125(c)(3)(A)   23
   §1125(c)(A)   20
   §1125(2)(B)   22

Bus. & Prof. Code §14330   19

Stats. 2007, c. 711 (A.B.1484)   19

**Other Authorities**

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed.
   2003)
   §12:2   2, 12
   §12:13   11, 13
   §24:89   22

*New Oxford American Dictionary*   3

*Oxford English Dictionary*   3

**INTRODUCTION**

When tech companies engage in legal squabbles about who gets to use our everyday words, what are ordinary speakers of the language to make of it all? ("The Great Language Land Grab," *The New York Times*, March 26, 2011) (Declaration of Sarah J. Givan ("Givan Decl.") Ex. 22 at 443)

In its Motion for Preliminary Injunction ("Motion"), Apple asserts that because it was the first to refer to its application download service for its mobile devices as an "app store," it is entitled to bar all competitors from using the term "app store" to refer to their own online stores that sell apps. At the core of this dispute is the distinction between names that are generic (and hence ineligible for trademark protection) and those that are distinctive (and hence eligible for trademark protection). A term is generic if it describes the type of product or service—*e.g.*, a bookstore, computer store, or app store—rather than the producer. Recent Ninth Circuit decisions are clear on the proper analysis to be employed when a company attempts to appropriate as a purported trademark a term that is synonymous with its product: a generic term answers the question "what are you?" By contrast, a distinctive mark—such as Amazon or Apple—answers the question "who are you?"

The word "app" is indisputably generic for "applications" that smartphone users download to their phones. Indeed, Apple does not claim trademark protection for "app" standing alone. Likewise, the term "store" is generic. Apple's claim for trademark protection, therefore, must rest on the argument that the combination of these two generic terms results in a protectable mark. But the term "app store" unquestionably answers the question "what are you?"—a store for apps. Apple's App Store is a store for apps that are compatible with Apple mobile devices. Amazon Appstore for Android is a store for apps that are compatible with Android mobile devices.

An owner of a purported mark who itself uses that mark generically is estopped as a matter of law from asserting protectability. In an October 18, 2010 conference call with financial analysts, Steve Jobs— Apple's founder and CEO—himself repeatedly used "app stores" generically to identify app stores for phones employing Google's Android operating system:

In addition to Google's own app marketplace, Amazon, Verizon and Vodafone have all announced that they are creating their own **app stores** for Android. There will be at least four **app stores** on Android which customers must search through to find the app they want and developers will need to work to distribute their **apps** and get paid. Contrast this with Apple's

1   integrated App Store, which offers users the easiest-to-use largest **app store** in the world,

2   preloaded on every iPhone. (Givan Decl. Ex. 11 at 51 (emphases added))

3       In addition to Apple's own admissions, below Amazon provides evidence of dictionary definitions

4   and generic use of "app store" by the media, industry press, competitors, and consumers.  *See* Part II(A).

5   The issue presented here is an important one with serious public policy implications:

6       To grant an exclusive right to one firm of use of the generic name of a product [or service]
        would be equivalent to creating a monopoly in that particular product, something that the
7       trademark laws were never intended to accomplish . . . . [A]s Judge Posner observed: "[I]t is
        no purpose of trademark protection to allow a firm to prevent its competitors from informing
8       consumers about the attributes of the competitors' brands."   (2 J. Thomas McCarthy,
        *McCarthy on Trademarks & Unfair Competition* §12:2, at 12-9 to 10 (4th ed. 2009) (footnote
9       omitted))

10      Apple's claim of likely confusion independently lacks merit.  As Apple acknowledges and customers

11  know, apps sold through Apple's App Store work *only* on Apple's mobile devices, while apps sold through

12  Amazon Appstore for Android work *only* on Android smartphones.  Customers who have shopped for and

13  purchased expensive mobile devices are, at the very minimum, sophisticated enough to know, if they choose

14  to buy apps at all, that the apps they acquire must be compatible with the device they own.  iPhone owners

15  simply cannot purchase apps from Amazon Appstore for Android, because Amazon only sells apps to

16  Android device owners.  In its failed attempt to fashion a legal theory, Apple improperly dismisses the

17  binding authority of the Ninth Circuit's most recent internet trademark decision—*Network Automation, Inc.*

18  *v. Advanced Systems Concepts, Inc*., 97 U.S.P.Q. 2d 2036 (9th Cir. 2011)—and asks this Court to apply an

19  analysis contrary to the law.  *See* Part II(B), *infra*.

20      Apple's theory of dilution likewise fails because anti-dilution laws were never intended to protect

21  generic terms like "app store," "credit card," "underwear," and "bookstore."  Only famous marks warrant

22  protection from dilution by blurring or tarnishment, and "app store" does not qualify.  *See* Part II(C), *infra*.

23  Even if "app store" were famous, Amazon's use of the term in Amazon Appstore for Android does not

24  dilute Apple's alleged mark, and Amazon's use of the term constitutes fair use and is not actionable.  *See id*.

25      This is not a close case.  Apple has no likelihood of success on the merits, and there is no likelihood of

26  immediate and irreparable harm absent a preliminary injunction.  Likewise, the balance of equities and the

27  public interest both weigh against an injunction.  Like Apple, Amazon and other retailers with app stores

28  must be able to call their app stores what they are.  Apple's Motion should be denied.

DEFS' OPP. TO PLAINTIFF'S MOT. FOR PRELIMINARY INJUNCTION      11-cv-01327 PJH

**HowardRice**

**STATEMENT OF FACTS**

**A.    Evidence Of The Genericness Of "App Store".**

Evidence of dictionary definitions, Apple's own generic use of "app" and "app store", and generic use by the general and industry press, competitors, and consumers themselves demonstrates that "app store" is a term that the relevant consuming public understands to denote a store for apps.

**1.    Dictionary Definitions Of "App", "Store", And "App Store".**

The *Oxford English Dictionary* defines "app" as "[a]n application, *esp.* an application program," and indicates that "app" has been in use since 1985.  Givan Decl. Ex. 1 at 1.  Other dictionaries confirm that "app" is a shorthand term for "application", and that an application, in the context of computing, is "a program or piece of software designed to fulfill a particular purpose." *Id.* Exs. 1-2.  The *New Oxford American Dictionary* defines "store" as "a retail establishment selling items to the public." *Id.* Ex. 3.  PC Magazine's online Encyclopedia defines "app store" as "an online store for downloading applications," and notes that Apple's App Store was "followed with the debut of app stores for the Android, Blackberry and new Windows phone platforms."  Declaration of Robert A. Leonard ("Leonard Decl.") Ex. 10; *see also* Givan Decl. Ex. 4 (definition of "online app stores").

The American Dialect Society, a leading group of United States linguists, recently voted "app" as the "Word of the Year" for 2010, noting that although the word "has been around for ages," it "really exploded in the last 12 months" with the "arrival of 'app stores' for a wide spectrum of operating systems for phones and computers." *Id.* Ex. 4.

**2.    Apple's Generic Use Of "App" And "App Store".**

As noted in Apple's Amended Complaint, Apple's App Store opened in July 2008.  Amended Complaint (Docket No. 16) ¶9.  Apple did not, however, coin the terms "app" or "app store."  As noted above, "app" has been around for decades, and the company Salesforce.com announced an "AppStore vision" in 2006, stating that its customers would "be able to use AppStore as a single source for trying, buying and deploying on-demand applications . . . ."  Givan Decl. Ex. 6.

Apple's App Store allows users to search, purchase, and download apps for their Apple mobile devices such as the iPhone, iPod, and iPad.  Amended Complaint ¶8.  Apple advertises its App Store as having "The World's largest collection of mobile apps," and invites users to "Download apps" and "Find

HowardRice

1   more perfect apps."  Givan Decl. Ex. 7.  Apple refers to its "App Store" as an "applications store" and an

2   "electronic store."  *Id*. Ex. 9 (2009 press releases calling Apple's App Store "the largest applications store in

3   the world) & Ex. 8 (in Apple's iOS Developer Program License Agreement, calling Apple's App Store "an

4   electronic store").

5        Apple does not own a federal registration for the term "app store."[1]  Significantly, Apple's 2009 press

6   releases *did not list* "App Store" as a trademark, despite listing many other trademarks such as APPLE,

7   iPAD, and iPHONE.  *See* Givan Decl. Ex. 9.  Even more telling, and indeed decisive, are the comments

8   made in October 2010 by Steve Jobs during an analyst call:

9        Amazon, Verizon and Vodafone have all announced that they are creating their own **app
         stores** for Android.  There will be at least four **app stores** on Android which customers must
10       search through to find the app they want . . . . (Givan Decl. Ex. 11 at 51 (emphases added))

11   Mr. Jobs then boasted that "Apple's Integrated App Store . . . offers users the easiest-to-use largest **app store**

12   in the world, preloaded on every iPhone."  *Id*.  His comments were published by Apple and widely reported

13   online and in the press, including NPR Morning Edition.  *Id*. Exs. 9, 12.

### 3.   Generic Use Of "App Store" By The Media, Industry Press, And Competitors.

16        "App store" is commonly used by the general and trade press as the name for online retail stores

17   featuring apps.  A representative sample includes:

18   *CNET.com*, October 21, 2008:

19        New mobile **app stores** launched by Apple, Google, and Research in Motion could shift the
         balance of power in the mobile market away from wireless operators and toward device and
20       platform developers.  (Givan Decl. Ex. 13 at 65)

21

22   *ABA Site-tation*, April 9, 2009:

23        Gizmodo has now published a comparison of the **"app" stores** offered for each of the major
         Smartphones.  **App stores** are the means by which Smartphone users browse, preview, and
24       purchase software to add functionality to their Smartphones.  The comparison looks at **app
         stores** for the iPhone, Android, Blackberry, Windows Mobile, Palm, and Nokia
25       (Symbian) . . . .  (*Id*. Ex. 13 at 73)

26        [1]Apple's Application No. 77/525,433 to register the mark APP STORE is the subject of Opposition
     No. 91195592, pending before the Trademark Trial and Appeal Board ("TTAB") in the United States
27   Patent and Trademark Office ("PTO").  The Opposer in that case, Microsoft Corporation, has asserted that
     "app store" is generic and, on January 10, 2011, filed a motion for summary judgment on that ground.
28   That motion is currently pending.  Givan Decl. ¶26 & Ex. 25.

HowardRice

*Wired.com*, August 31, 2009:

> Samsung Joins the **App Store** Party . . . .  Since Apple introduced the iPhone App Store as a centralized clearing house for mobile applications in 2008, **app stores** have become an important part of the business strategy for most handset makers.  Blackberry manufacturer Research in Motion, Palm and Nokia have all launched **app stores** this year.  (*Id.* Ex. 13 at 77)

*New York Times*, November 26, 2009:

> THE RISE OF THE **APPS** . . . .This year, the idea caught fire.  New **app stores** opened for the Blackberry, Palm phones (the Pre and Pixi) and Windows smartphones.  They join the existing **stores** for the iPhone/iPad Touch and phones that run on Google's Android phone software.  (*Id.* Ex. 14 at 149)

*Investor's Business Daily*, September 29, 2010:

> **App Stores** Offer Feast For Window-Shoppers Applications abundant for iPhone, BlackBerry, Android smartphones . . . .A smart phone is anything but a mere phone nowadays. The name of the game: apps . . . .When users poke around smart-phone **app stores**, they find a wide range of applications . . . .  (*Id.* Ex. 14 at 157)

*CNN.com*, December 22, 2010

> **App stores** are booming, but there may not be enough applications to fill them all.  Google, Apple and Facebook all maintain **app** marketplaces for their respective platforms and more companies are preparing to launch their own **stores** . . . .Browser makers Mozilla and Opera Software are each working on **app stores** that could tie into their desktop and mobile browsers. (*Id.* Ex. 13 at 125)

*See also* Ex. 15 (headlines using plural term "app stores"); Ex. 16 (Wikipedia article re Apple App Store noting that "[a]fter the success of Apple's App Store, and the launch of similar services by its competitors, the term 'app store' has been used to refer to any similar service for mobile devices").

"App store" is also used by other retailers to refer to their stores, such as DIRECTV App Store; @metro App Store; Sprint Partner App Stores; White Label App Store; Shopify App Store; Palm App Store; Appstore for Symbian; Mobile2Day Appstore for Blackberry; Handango Mobile App Store; AndAppStore; Handmark Mobile App Store for Android; Sentrion App Store; DC App Store; MobiHand App Store Launcher; DNAappstore; The PC App Store; iPAQ Appstore; GetJar app store; Mini App Stores; Tristit App Store; MiKandi App Store; and Android App Store.  Givan Decl. Exs. 17-18, 21.  As of March 2011, there were over 2,100 active registered domain names containing the term "app store."  *Id.* Ex. 20.  Inventors have also used the term "app store" generically in patent applications.  *Id.* Ex. 19.

In its Motion, Apple cites to isolated statements to suggest that the press and public agree that Apple should be able to appropriate the generic term "app store." Mot. at 21. To the contrary, Apple's lawsuit has actually been met by the press and consumers with incredulity:

> *ReadWriteWeb*, "Apple Says Other App Stores Can't Be Called App Stores," March 21, 2011:
>
> Intel has an **app store**, Samsung, Motorola and LG have **app stores**. My local public transit agency in Portland, Oregon has an **app store**. I bet you can think of some **app stores** too. Google News can find more than 6,000 news stories that used the word App Store in 2010 alone—excluding stories that include any words associated with Apple products!

> *MediaPost MoBlog*, "Appsolutely Ridiculous Lawsuit," March 22, 2011:
>
> Apparently, there's many **app stores**—but only one App Store. That's essentially Apple's claim in its trademark suit against Amazon . . . . But the term **"app store"** is commonly used to refer to the app storefront of any company operating one, as in the "GetJar **app store**" or the "Blackberry **app store**." Other companies may have specific branded names for their app stores, like Android Market or Blackberry App World, but the generic term for this category of retailing is "**app store**."

> *Pittsburgh Post-Gazette*, March 27, 2011:
>
> By the way, as soon as Amazon announced its **app store**, Apple sued, claiming that it violates the trademark Apple has applied for on the words "**app store**." Give me a break.

(Givan Decl. Ex. 22 (emphases added)).

### 4. Generic Use Of "App Store" By Consumers.

Like the press, consumers also use "app store" to refer to online app stores offered by Apple's competitors, as demonstrated by postings on Internet blogs and recent Congressional testimony, *e.g.*:

> *Posted by tk772 on engadget.com:*
>
> If someone has apps from 5 different **app stores**, how do they update all their apps? Will they have to log into each store and check for updates? Will they have to have 5 **app store** updater background tasks running? . . . (Givan Decl. Ex. 23 at 457)

> *Posted by Kevin Krause on October 11, 2010 on phandroid.com:*
>
> Now that it is all but confirmed that Amazon will be pitching their own Android **app store** . . . We have long been familiar with the idea of carrier-centric **app stores** with Android. (Givan Decl. Ex. 23 at 464)

> *Posted by Hendrix on October 11, 2010 on phandroid.com:*
>
> Yeah, I honestly don't see a need for 5000 **app stores**. (Givan Decl. Ex. 23 at 466)

> Congressional testimony of Ashkan Soltani, March 16, 2011:
>
> Mobile phones, televisions, set top boxes . . . are now equipped with Internet connectivity and

HowardRice

can leverage Web services which include online advertisement. Some of these platforms also allow applications written by third parties, the most prominent example being **app stores** on mobile smartphones.  (Givan Decl. Ex. 24 at 475)

### B.   Amazon Appstore For Android.

Founded by Jeff Bezos in 1994, Amazon went online in 1995 at www.amazon.com, starting as an online bookstore.  It soon diversified, selling DVDs, CDs, MP3 downloads, computer software, video games, electronics, apparel, furniture, toys, and more.  Amazon is one of the largest online retailers in the United States, with over 33,000 employees and over $34 billion in total annual gross revenue in 2010. Declaration of Aaron Rubenson ("Rubenson Decl.") ¶12.

Amazon decided in 2010 to sell Android smartphone apps through its own online store—Amazon Appstore for Android.  Amazon's intention to open an app store for Android apps became public in October 2010.  *Id.* ¶3.  On March 22, 2011, Amazon launched Amazon Appstore for Android on www.amazon.com. Amazon Appstore for Android is an app store that allows consumers to view and download apps for their Android devices.  Users may shop either on the www.amazon.com website, or from the Amazon Appstore app on their Android mobile devices.  As reflected by its name and explained on Amazon's website, apps sold at Amazon Appstore for Android are compatible only with Android devices.  Thus, only customers who own Android devices and have downloaded the Amazon Appstore for Android app onto their Android smartphone may use Amazon Appstore for Android.  *Id.* ¶4.  Amazon Appstore for Android does not offer apps for use with Apple mobile devices such as the iPhone, iPad, or iPod.  *Id.* ¶6.

### ARGUMENT

### I.    A PRELIMINARY INJUNCTION IS AN EXTRAORDINARY REMEDY.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and internal quotation marks omitted).  Such relief is "to be issued sparingly." *Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254 (N.D. Cal. 2003).

To obtain injunctive relief, a plaintiff must prove: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent a preliminary injunction, (3) that the balance of equities tips in favor of issuing an injunction and (4) that an injunction is in the public interest." *Maxim Integrated Prods. v. Quintana*, 654 F. Supp. 2d 1024, 1030 (N.D. Cal. 2009) (citing *Winter v. Natural Res. Defense Council*, 555

1   U.S. 7 (2008), and holding that after *Winter*, a trademark plaintiff is no longer entitled to a presumption of

2   irreparable harm on the ground that it has shown a likelihood of success on the merits).  Apple has not met

3   this stringent burden.

### II.   APPLE HAS FAILED TO DEMONSTRATE THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AT TRIAL.

#### A.   The Unregistered Term "App Store" Is Generic.

7       Potential trademarks fall into four categories of increasing distinctiveness: (1) generic, (2) descriptive,

8   (3) suggestive, and (4) arbitrary or fanciful.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768

9   (1992); *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 872 (9th Cir. 2002).  Generic terms

10  "are common words or phrases that describe a class of goods rather than an individual product."  *Japan*

11  *Telecom,* 287 F.3d at 872 (citation and internal quotation marks omitted).  A generic term "cannot be the

12  subject of trademark protection under any circumstances, even with a showing of secondary meaning."

13  *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc*., 198 F.3d 1143, 1146-47 (9th Cir. 1999).

14      By contrast, a descriptive term "describe[s] the qualities or characteristics of a product."  *KP*

15  *Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005); *see also*

16  *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979) (a descriptive

17  term "specifically describes a characteristic or ingredient of an article or service"); *Henri's Food Prods. Co.*

18  *v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1306 (7th Cir. 1987) (concluding that "tasty" was descriptive, not

19  generic, since it describes a *quality* found in many types or genuses of salad dressing; contrasting "French

20  dressing" as generic because it represented a *type* or category of dressing).  A descriptive term can be

21  trademarked, but only if it "has acquired 'secondary meaning' in the minds of consumers, *i.e*., it has become

22  distinctive of the [trademark] applicant's goods in commerce."  *Filipino Yellow Pages,*198 F.3d at 1147

23  (citation and some internal quotation marks omitted).[2]   However, "[a] mark is not descriptive merely

24  because it conveys some minimal information about a product or service; if all it 'describes' is the common

25  name of the product or service, it is not protectable as a trademark."  *Advertise.com, Inc. v. AOL Adver., Inc*.,

26  616 F.3d 974, 982 (9th Cir. 2010) (citing *Filipino Yellow Pages*, 198 F.3d at 1147 ("Courts sometimes refer

27

28          [2]Suggestive, arbitrary, and fanciful terms are considered inherently distinctive and are valid and protectable without any proof of secondary meaning. *Two Pesos, Inc.*, 505 U.S. at 768.

1    to generic terms as 'common descriptive' names, the language used in the Lanham Act for terms incapable

2    of becoming trademarks")).

3         Apple's alleged "App Store" mark is not federally registered.  In such cases, "the plaintiff has the

4    burden of proving nongenericness once the defendant asserts genericness as a defense."  *Filipino Yellow*

5    *Pages*, 198 F.3d at 1146.  Apple cannot meet this burden.

### 1.    The Ninth Circuit Test For Genericness Compels A Finding That The Term "App Store" Is Generic For A Store Featuring "Apps".

8         Apple's claim that "app store" is *suggestive* and thus inherently distinctive (Mot. at 8) is beyond

9    aggressive.  Apple itself calls its App Store an "applications store."  Givan Decl. Ex. 7.  Apple's Amendment

10   to Allege Use under 15 U.S.C. Section 1051(c), filed with the USPTO on November 20, 2009, to prove use

11   of APP STORE in connection with its Application No. 77/525,433, demonstrates what Apple cannot dodge

12   through use of creative synonyms—that Apple's App Store is simply an online store where consumers can

13   search for, choose, and download apps online.[3]  *See* Givan Decl. ¶11 & Ex. 10.

14        Because "app store" is not inherently distinctive, the validity of Apple's purported APP STORE mark

15   turns upon whether it is generic or descriptive.  The "ultimate test of whether a trademark is generic"

16   involves "determining how a term is understood by the consuming public."  *Filipino Yellow Pages*, 198 F.3d

17   at 1148 (citation omitted) (finding FILIPINO YELLOW PAGES generic because the consuming public

18   understood it to mean a telephone directory for the Filipino-American community) (citing *Surgicenters of*

19   *Am., Inc.*, 601 F.2d at 1017 (finding SURGICENTER generic because the consuming public generally

20   understood it to mean surgical centers)).

21        The Ninth Circuit relies upon the "who-are-you/what-are-you" test to answer this question: "A mark

22   answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?'  But

23   the generic name of the product answers the question 'What are you?'  Under this test, if the primary

24   significance of the trademark is to describe the *type of product* rather than the *producer*, the trademark is a

25   generic term and cannot be a valid trademark."  *Filipino Yellow Pages*, 198 F.3d at 1147 (citations, brackets,

26   and some internal quotation marks omitted; emphases in original). When a company running an app store is

27        [3]*The Money Store v. HarrisCorp Fin., Inc*., 689 F.2d 666 (7th Cir. 1982), cited by Apple (Mot. at 8-
28   9), is distinguishable because plaintiff was not selling money.  Apple *is* selling apps.

1   asked to identify "what" its service is, it would be entirely appropriate to respond "an app store".  Likewise,

2   asking one of Apple's competitors "Could you refer me to an app store?," one would hardly be surprised if

3   they offered their own services.  *See Advertise.com, Inc*, 616 F.3d at 978 (engaging in same analysis for

4   "advertising dot-com").

5       Evidence of dictionary definitions, Apple's own generic use, and generic usage by the media, relevant

6   industry, and consumers compels a finding of genericness.

7                    **a.    Dictionary Definitions Demonstrate That "App Store" Is Generic.**

8       Dictionary definitions are "'relevant and often persuasive in determining how a term is understood by

9   the consuming public, the ultimate test of whether a trademark is generic.'"  *Filipino Yellow Pages*, 198 F.3d

10  at 1148 (citation omitted).  "Although the distinctiveness inquiry considers the impression conveyed by the

11  mark as a whole, [courts] are permitted to begin our inquiry by separately viewing the component parts of

12  the mark."  *Advertise.com, Inc.*, 616 F.3d at 977 (citations omitted).  Accordingly, the first step is to consider

13  "app" and "store" taken separately.  *Id.*

14      There can be no dispute that the term "app" is a generic shorthand for "application," which is a

15  software program designed for a particular purpose for use on phones or computers.  *See* Part A(1), *supra*.

16  The word "app" is so well-known that it was the "Word of the Year" in 2010.  *Id.*  There can also be no

17  dispute that the term "store" is generic.  *See id.*, *supra*.  According to their common meanings, the terms

18  "app" and "store" together denote a store for apps, which even Apple's own evidence demonstrates.  *See*

19  Leonard Decl. ¶39 & Ex. 10.

20      Case law has established that terms that combine the generic name of a product with the generic

21  designator "store" are generic and unregistrable for retail store services featuring the product.  *See, e.g.*,

22  *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) ("Generic marks are

23  the weakest and not entitled to protection-they refer to a class of which an individual service is a member

24  (e.g., 'liquor store' used in connection with the sale of liquor)"); *S. S. Kresge Co. v. United Factory Outlet,*

25  *Inc.* 598 F.2d 694, 696 (1st Cir. 1979) ("the term 'mart' is generic since it is another word for store or

26  market"; affirming denial of K-Mart's motion for preliminary injunction to prevent defendant from using the

27  name "The Mart" on the basis that "mart" was generic); *In re The Computer Store, Inc.*, 211 U.S.P.Q. 72

28  (T.T.A.B. 1981) (noting that applicant's marketing materials described its services as a "store" and finding

1   that THE COMPUTER STORE was generic for an establishment where computers and computer parts were

2   sold and serviced).  That app stores are online rather than "brick and mortar" does not change this analysis.

3   *See In re 1800Mattress.com IP, LLC*, 586 F.3d 1359, 1364 (Fed. Cir. 2009) ("online mattress stores" and

4   "mattress.com" are both generic for online stores in the field of bedding).  Indeed, Apple identifies both its

5   "online store" and "retail store" on its website.  Givan Decl. Ex. 7.

> **b.  Apple Uses "App Store" Generically To Refer To Its Own And Its Competitors' App Stores.**

8   When the proponent of a trademark uses the term generically itself, this "is strong evidence of

9   genericness."  *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 545 (4th Cir. 2004) (quoting 2 J. Thomas

10  McCarthy, *McCarthy on Trademarks and Unfair Competition* §12:13 (4th ed. 2003)) (finding "freebies"

11  generic and noting that the owner of www.freebies.com had used it generically on the website); *see also CG*

12  *Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1029 (N.D. Cal. 2008) ("a kind of estoppel arises

13  when the proponent of a trademark use is proven to have itself used the term before the public as a generic

14  name" (citations and internal quotation marks omitted)).

15  As shown above, Apple frequently uses the term "app" generically to refer to the applications featured

16  in its App Store.  *See* Part A(2), *supra*.  Apple refers to its App Store as an "application store" and an

17  "electronic store."  *See id.*, *supra*.  Steve Jobs himself has referred to Apple's App Store as "the easiest-to-

18  use largest app store in the world", and used the plural term "app stores" to refer to competitors' app stores

19  for Android phones.  *See id., supra*.  As noted in a recent *New York Times* article, "[b]lithely pluralizing 'app

20  store' like that is no way to protect a trademark that is supposed to be distinctive."  Givan Decl. Ex. 22 at

21  444.

22  Accordingly, Apple "has admitted that the primary significance of its ["App Store"] trademark is to

23  describe the type of product (or, "what are you?"), which is a clear indication of a generic mark."  *Network*

24  *Automation, Inc. v. Hewlett-Packard Co.*, No. CV-08-4675 JFW (RZx), 2009 WL 5908719, at *5 (C.D. Cal.

25  Sept. 14, 2009).  Apple is estopped from now claiming otherwise.

> **c.  Usage In The Media, By Competitors, and Consumers Confirm That "App Store" Is Generic.**

28  Federal courts also view generic usage of a term by the media and others in the industry as "strong

1    evidence of how the public perceives the term." *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F.

2    Supp. 2d 1181, 1189-91 (C.D. Cal. 2007).  As shown above, numerous articles mentioning "app stores"

3    demonstrate that the mark answers "what" Apple's App Store is—an online store featuring applications.  *See*

4    Part A(3), *supra*; Givan Decl. Exs. 13-18.  Likewise, the words "app store" are often used by other app

5    stores generically, as part of their own names, and in their domain names.  *See id., supra*; Givan Decl. Exs.

6    20-22; *Advertise.com, Inc.*, 616 F.3d at 980 (noting evidence of domain names incorporating

7    "advertising.com" could be "sufficient to prove genericness under a clear evidence standard when the

8    elements of the mark are highly generic, even in the face of substantial rebuttal evidence") (citing *In re*

9    *Hotels.com*, 573 F.3d 1300, 1304-06 (Fed. Cir. 2009) (declarations that mark was not generic and a

10   customer survey did not negate ultimate conclusion of genericness)).  Finally, there is direct evidence that

11   consumers themselves view and use "app store" generically.  Givan Decl. Exs. 23-24.

12         Apple points out that other competitors "have all found terms other than APP STORE" to name their

13   app stores.  Mot. at 11.  But the fact that alternate names may also describe an "app store" (*e.g.*, "app

14   market" or "app catalog") is irrelevant.  "[T]he existence of synonyms for a term does not mean the term is

15   not generic.  There may be more than one term which the consuming public understands as designating a

16   category of goods." *Loctite Corp. v. Nat'l Starch & Chem. Corp.*, 516 F. Supp. 190, 201 (S.D.N.Y. 1981)

17   (noting that "super glue", "instant glue", "ten second glue" were all generic).  *See also Ale House Mgmt.,*

18   *Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 141 (4th Cir. 2000) ("['Ale house'] are generic words for a

19   facility that serves beer and ale, with or without food, just as are other similar terms such as 'bar,' 'lounge,'

20   'pub,' 'saloon,' or 'tavern'"); *Weeks Dye Works, Inc. v. Valdani, Inc.*, No. 92049174, 2010 WL 2104147, at

21   *6 (T.T.A.B. May 11, 2010) ("the fact that another term is available for use by competitors does not

22   transform a generic term into capable matter"); 2 J. Thomas McCarthy, *McCarthy on Trademarks and*

23   *Unfair Competition*, §12:2, at 12-9 to 10  (4th ed. 2003) (discussing hypothetical claim to generic term "cell

24   phone" requiring competitors to use "wireless phone" or "portable phone" as alternate names).

25         Apple asserts that virtually all of its competitors who tried to use "app store" gave up when Apple sent

26   cease and desist letters.  Mot. at 6.  First, the exercise by Apple of its considerable muscle proves nothing

27   more than its aggressiveness.  Second, the assertion is untrue.  Others are using the term (Givan Decl.

28

1    Exs. 20-21); Microsoft is opposing registration of the term in the TTAB; and others have initiated foreign

2    cancellation proceedings.  Givan Decl. ¶26 & Ex. 25.

3            **d.    Alleged Consumer Awareness Of Apple's App Store Cannot Negate
                      Genericness.**

4

5            Apple asserts that its App Store has achieved secondary meaning and is famous among consumers.[4]

6    Mot. at 6.  But whether Apple's App Store has obtained secondary meaning is irrelevant to the question of

7    whether "app store" is generic, as no amount of secondary meaning can make a generic mark protectable.

8    *Filipino Yellow Pages*, 198 F.3d at 1146 ("If the term is generic, it cannot be the subject of trademark

9    protection under any circumstances, even with a showing of secondary meaning"); *Retail Servs., Inc*, 364

10   F.3d at 547 ("Evidence of an acquired secondary meaning, however, has no relevance unless the mark in

11   question has been found not to be generic"); *America Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 822 (4th

12   Cir. 2001) (finding that "You Have Mail" was generic despite evidence that AOL was "the most widespread

13   user of the phrase").

14           There is no dispute that Apple was an early successful entrant into the app business.  But Apple cannot

15   block competitors from using a generic name just because it was the first to popularize app stores.  "To allow

16   trademark protection for generic terms, . . . even when [they] have become identified with a first user, would

17   grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."

18   *Advertise.com, Inc.*, 616 F.3d at 981 (quoting *Surgicenters of Am., Inc. v. Med. Dental Surgeries Co.*, 601

19   F.2d 1011, 1017 (9th Cir. 1979) (quotation marks omitted)).  Any secondary meaning or fame Apple has in

20   "App Store" is *de facto* secondary meaning that cannot convert the generic term "app store" into a

21   protectable trademark.  *See Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F. Supp. 1270, 1275

22   (S.D.N.Y. 1983) (evidence that consumers associated "Shuttle" with Eastern Airlines did not mean "shuttle"

23   was not generic; "[a]ll it demonstrates is that a likely response to any generic word is the name of the best

24   known producer or manufacturer of that product"); *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118-19

25   ────────────────

26            [4]Apple relies heavily on the Declaration of Robert A. Leonard to support its argument of secondary
     meaning and non-genericness.  *See* Mot. at 5-6 & 9-11.  Amazon notes that Apple filed a very similar
27   Leonard Declaration in Opposition No. 91195592 on February 28, 2011.  On March 29, 2011, Microsoft
     filed the Declaration of Dr. Ronald R. Butters, which revealed numerous flaws and omissions in Leonard's
28   purported analysis.  Givan Decl. Exs. 26-27.  Amazon incorporates Butters' critique by reference.

HowardRice

1   (1938) (rejecting claim that plaintiff had exclusive right to use generic name "shredded wheat" because it

2   had become associated with plaintiff as the first user); *In re Jonathan Drew, Inc. dba Drew Estate*, Serial

3   No. 78979742, 2009 WL 5253035, at *5 (T.T.A.B. Dec. 31, 2009) ("We do not question that applicant may

4   be a 'leading maker' . . . of 'infused cigars' or even that applicant coined the term.  The problem is that none

5   of these facts overcomes the generic meaning of 'infused cigars' . . . ").

6        In any event, "[t]he volume of evidence required to show, or disprove, the validity of a trademark is

7   not well-suited to the early stages of litigation such as [a] motion for preliminary injunctive relief."

8   *Microsoft Corp. v. Lindows.com, Inc.*, 2002 WL 31499329, 64 U.S.P.Q. 2d (BNA) 1397, 1410 (W.D. Wash.

9   2002).  In *Microsoft*, Microsoft sought a preliminary injunction against Lindows.com based on its registered

10  mark WINDOWS.  Microsoft presented compelling evidence that WINDOWS had acquired secondary

11  meaning, but Lindows.com presented substantial evidence that WINDOWS was generic.  *Id.* at 1403, 1410.

12  Noting that "the validity of the Windows mark is a threshold issue upon which all subsequent analysis . . .

13  depends," the court found that serious questions were raised about the validity of its mark, and denied the

14  request for a preliminary injunction.  *Id.* at 1410, 1411.  Similarly in *Dymo Indus., Inc. v. TapePrinter, Inc.*,

15  326 F.2d 141 (9th Cir. 1964), the threshold was the difficult question of whether the registered

16  TAPEWRITER mark was "so descriptive of a product that writes on plastic and metal tapes as to make it

17  ineligible for registration."  *Id.* at 142.  Appellee had introduced some evidence "which upon further

18  development may disclose the mark was not subject to registration."  *Id.* at 143.  Noting that "a preliminary

19  injunction is the exercise of a very far reaching power never to be indulged in except a case clearly

20  warranting it" (*id.*), the Ninth Circuit affirmed denial of a preliminary injunction.

21        Notwithstanding Amazon's inability to conduct a survey or engage in discovery due to time

22  constraints, the press, competitors, consumers, and even Apple's own founder and CEO Steve Jobs all use

23  "app store" to refer to the entire category of online stores that allows users to download apps for their mobile

24  phones.  No matter how popular Apple's App Store might be, "app store" is generic.

25  **B.   Even If "App Store" Is Not Generic, Apple Cannot Demonstrate Any Likelihood**
    **Of Confusion, Let Alone The Clear Showing Required For Preliminary Relief.**

26

27        Apple's trademark infringement claim also fails because it cannot show that consumers are likely to

28  confuse Amazon Appstore for Android with Apple's App Store; *i.e.*, there is no confusion as to the origin of

DEFS' OPP. TO PLAINTIFF'S MOT. FOR PRELIMINARY INJUNCTION      11-cv-01327 PJH

1    the goods or services the respective companies offer. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.

2    1979). As previously noted, Apple acknowledges a fact critical to this analysis: apps sold at Apple's App

3    Store work only on Apple's mobile devices and apps sold at Amazon Appstore for Android work only on

4    Android devices. Mot. at 14. So even the hypothetical Apple iPhone owner browsing at Amazon Appstore

5    for Android will realize immediately that she cannot purchase apps there for her Apple device. Surely Apple

6    is not suggesting that this customer is then likely to abandon her iPhone in favor of an Android smartphone

7    so that she may purchase apps at Amazon Appstore for Android.

8         Customers of Apple's App Store and Amazon Appstore for Android are most definitely not the

9    careless or "less technologically savvy" consumers Apple describes them to be. *Id.* at 16. They are

10   sophisticated consumers who have an expensive purchase in common: each is an owner of at least one

11   mobile device. A new iPhone 4, for example, without subscribing to a wireless plan, costs $599 for 16GB

12   ($199 with 2 year phone plan) and $699 for 32GB ($299 with 2 year phone plan). Givan Decl. Ex. 28. The

13   various types of smartphones that use the Android operating system can range from $239.99 and $599.99 for

14   the phone itself without a phone plan. Givan Decl. Ex. 29. A Google survey, in fact, found that smartphone

15   buyers are highly discriminate shoppers who invest time in shopping for their purchase: 17% spent 4 weeks

16   or more; 25% spent 1 week but less than 4 weeks; and 20% spent more than 2 days but less than 1 week.

17   Givan Decl. Ex. 30 (*Wireless Shoppers 2.0: How Consumers Shop for Wireless Phones* (February 2010)).

18   Apple would have this Court believe that these same smartphone customers are nevertheless unable to

19   discern that Amazon Appstore for Android does not sell apps for their Apple devices.

20        One need go no further than the name Amazon Appstore *for Android* to see that apps sold by Amazon

21   are for Android devices. To purchase apps through Amazon Appstore for Android, a consumer must

22   provide an email or telephone number at the "Get Started" box on Amazon Appstore for Android's home

23   page that opens a window with the following message: "Start using the Amazon Appstore *on your Android*

24   *device* in a few simple clicks" (emphasis added). Paleja Decl. ¶4. The consumer then receives a notification

25   via email: "Download the Amazon Appstore app immediately by clicking https://www.amazon.com/app-

26   email *from your Android device*" (emphasis added). *Id.*

27        No wonder that Apple relegates the most recent Ninth Circuit Internet trademark decision to a

28   footnote (Mot. at 13 n.3) and disregards its binding authority to claim that a "trinity" of factors should take

DEFS' OPP. TO PLAINTIFF'S MOT. FOR PRELIMINARY INJUNCTION    11-cv-01327 PJH

HowardRice

priority in internet cases: (1) similarity of marks; (2) relatedness of goods; and (3) similarity of marketing channels (*id.* at 12).  *Network Automation, Inc. v. Advanced Systems Concepts, Inc*., however, expressly rejects the rote application of this "Internet trinity", because "it makes no sense to prioritize the same three factors for every type of potential online commercial activity" (97 U.S.P.Q. 2d 2036, 2043 (9th Cir. 2011)):

> [W]e did not intend [ ] to forever enshrine these three factors—now often referred to as the 'Internet trinity' or 'Internet troika'—as the test for trademark infringement on the Internet. . . . Depending on the facts of each specific case arising on the Internet, other factors may emerge as more illuminating on the question of consumer confusion.  (*Id.*  at 2038 (reversing the district court's decision and vacating preliminary injunction against plaintiff's use of defendant's trademark as a search-engine keyword))

Here, the nonexhaustive *Sleekcraft* factors used to evaluate likelihood of confusion redounds in Amazon's favor.  *See Sleekcraft*, 599 F.2d  at 348-49.

### 1.   Smartphone Consumers Are Aware That There Is No Overlap In Goods.

Both Apple and Amazon have app stores.  However, the relevant inquiry is whether app customers will mistakenly assume that there is an association between the parties' app stores.  Even where the products at issue are "virtually interchangeable," this factor "must be considered in conjunction with the labeling and appearance of the advertisements and the degree of care exercised by the consumers [ ]."  *Network Automation, Inc.*, 97 U.S.P.Q. 2d at 2044 ("the proximity of the goods would become less important if advertisements are clearly labeled or consumers exercise a high degree of care, because rather than being misled, the consumer would merely be confronted with choices among similar products").

As demonstrated by the purchase of their expensive mobile devices, Apple's and Amazon's app store customers are sophisticated consumers.  *See* p. 15, *supra*.  Ignoring *Network Automation*, Apple contends in its Motion that the "Ninth Circuit has counseled that consumers are unlikely to exercise significant care when navigating the internet" and cites *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199 (9th Cir. 2000).  Mot. at 16.  Yet, the Ninth Circuit has expressly disregarded *GoTo.com* as outdated:

> [T]he district court improperly concluded that this factor weighed in [appellee's] favor based on a conclusion reached by our court more than a decade ago in *Brookfield* and *GoTo.com* that Internet users on the whole exercise a lower degree of care.  While the statement may have been accurate then, we suspect that there are many contexts in which it no longer holds true.  (*Network Automation*, 97 U.S.P.Q. 2d at  2046)

Because "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace" (*id.*), the relevant consumer is "a reasonably

1   prudent consumer accustomed to shopping online for expensive products" (*Toyota Motor Sales, USA, Inc. v.*

2   *Tabari*, 610 F.3d 1171, 1176 (2010)).   "Unreasonable, imprudent and inexperienced web shoppers are not

3   relevant." *Id.*

4        Perhaps implicitly acknowledging the weakness of its analysis, Apple claims that actionable "initial

5   interest" confusion may arise even if no sales are consummated.  Mot. at 14.  However, "it would be wrong

6   to expand the initial interest confusion theory of infringement beyond the realm of the misleading and

7   deceptive to the context of legitimate comparative and contextual advertising."  *Network Automation, Inc.*,

8   97 U.S.P.Q. 2d at 2042.  Where the service in question is prominently labeled as that of a competitor's (here,

9   Android), no one can be confused.

10        This factor favors Amazon, and, indeed, is by itself dispositive.  *Id.* at 2041 ("[t]he *Sleekcraft* factors

11   are intended as an adaptable proxy for consumer confusion, not a rote checklist"); *Dreamwerks Prod.*

12   *Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ("The factors should not be rigidly weighed;

13   we do not count beans").

14        **2.   "App Store" Is Weak.**

15        The stronger a mark, the greater the protection it is accorded by trademark laws.  *See Network*

16   *Automation, Inc.*, 97 U.S.P.Q. 2d at 2043 (citing *Brookfield*, 174 F.3d at 1058).  The relevant measurement

17   here is conceptual strength, which depends largely on the obviousness of the mark's connection to the good

18   to which it refers.  *Id.*.  "App store" is generic.  Section II(A), *supra*.  The weakness of "app store" is

19   probative because a consumer searching for an "app store" is more likely to be searching for a store that sells

20   apps—*i.e.*, a product category.  By contrast, a user searching for a distinctive term is more likely to be

21   looking for a particular product (*e.g.*, NIKE rather than shoes; TIFFANY rather than bracelets; BURBERRY

22   rather than raincoats).

23        Apple's claim to strength is based primarily on its alleged advertising efforts and the purported

24   number of apps sold—*i.e.*, "commercial strength."  Mot. at 15-16.  The Ninth Circuit has instructed that

25   commercial strength should not be considered in deciding a preliminary injunction motion: "commercial

26   strength, . . . as an evidence-intensive inquiry, is unnecessary at the preliminary injunction stage."  *Id.* at

27   2044.  This factor favors Amazon.

28

DEFS' OPP. TO PLAINTIFF'S MOT. FOR PRELIMINARY INJUNCTION     11-cv-01327 PJH

1

**3.    There Is No Evidence That Amazon Intended To Mislead Consumers.**

2      No evidence of ill intent exists.  Mere knowledge of a plaintiff's mark does not come close to showing

3  bad faith, especially where the defendant—like Amazon—believes the use to be generic and lacking in

4  confusion.  *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644-45 (7th Cir. 2001) (rejecting plaintiff's

5  claim that knowledge of its mark demonstrated bad faith, concluding that use of a descriptive phrase is

6  consistent with intent to inform consumers about properties of defendant's own product and not to pass-off).

7

**4.    The Marks As Encountered In The Marketplace Are Not Similar.**

8      Apple claims that this factor weighs in its favor because (1) both parties use "app" and "store"; and

9  (2) use of the housemark AMAZON with Appstore is either irrelevant or exacerbates consumer confusion.

10  Mot. at 13-14.  Apple overlooks the requirement that, in judging similarity, marks are considered as they are

11  encountered in the marketplace.  *See Sleekcraft*, 599 F.2d at 351.

12     Given the undeniable fame of AMAZON, the dominant impression on consumers encountering

13  Amazon Appstore for Android is that it is an Amazon product to be used on Android smartphones; *i.e.*, it

14  has a dissimilar commercial impression to Apple's App Store.[5]  Notwithstanding Apple's denial, prominent

15  use of a housemark reduces or eliminates the likelihood of confusion.  *Cohn v. Petsmart, Inc.*, 281 F.3d 837,

16  842 (9th Cir. 2002); *see Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("prominent

17  use of its well-known house brand [DENTYNE] . . . significantly reduces, if not altogether eliminates, the

18  likelihood that consumers will be confused as to the source of the parties' products").  Here, the addition of

19  the house mark AMAZON and the phrase "for Android" mitigate against any likely confusion.

20

**5.    There Is No Evidence Of Actual Confusion.**

21     While the importance of actual confusion is diminished at the preliminary injunction stage, Apple

22  concedes that "it is not feasible for Apple to obtain substantial evidence of actual confusion."  Mot. at 16; *cf.*

23  *Network Automation, Inc.*, 97 U.S.P.Q. 2d at 2045 ("a showing of actual confusion among significant

24

---

25     [5]The cases cited by Apple (Mot. at 13-14) both involved a defendant blatantly misappropriating a
   plaintiff's well-known marks.  *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079,

26  1088 (7th Cir. 1988) (defendants' use of virtually unknown house mark "24K Polar Puff" in conjunction
   with plaintiffs' well-known International Kennel Club mark to sell stuffed dogs was a "poor excuse for the
   defendants' blatant misappropriation of the plaintiffs' name"); *A. T. Cross Co. v. Jonathan Bradley Pens,*

27  *Inc.*, 470 F.2d 689, 690-91 (2d Cir. 1972) (defendant's sale of pens under name "La Crosse by Bradley"
   with description "Inexpensive but looks like the high priced model" was clearly designed to evoke the
   famous CROSS pen brand).

28

DEFS' OPP. TO PLAINTIFF'S MOT. FOR PRELIMINARY INJUNCTION     11-cv-01327 PJH

numbers of consumers provides strong support for the likelihood of confusion"). This factor has no effect at this point in the case.

### 6. The Parties' Use Of A Common Marketing Channel Is Irrelevant.

Apple claims that the fact that both parties advertise and sell apps on the Internet is highly probative. Mot. at 15. The Ninth Circuit has expressly rejected this theory. "Today, it would be a rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation, Inc.*, 97 U.S.P.Q. 2d at 2045. Notwithstanding the irrelevance of this factor, a salient fact here is that apps compatible with Apple's devices can only be purchased at Apple's App Store.

### 7. There Is No Likelihood Of Expansion.

Amazon cannot expand into sales of apps for Apple devices without Apple's permission. Thus, this factor is irrelevant to the analysis at hand and does not favor entry of preliminary relief.

All relevant factors weigh in Amazon's favor; no likelihood of confusion exists.

### C. Apple Cannot Demonstrate Any Likelihood Of Dilution, Let Alone The Clear Showing Required For Preliminary Relief.

Apple cannot establish a likelihood of dilution because (1) "app store" is not a famous mark; (2) the statutory blurring factors weigh in Amazon's favor; and (3) tarnishment is inapplicable to this case. 15 U.S.C. §1125(c)(1).[6] The Ninth Circuit has used Tylenol snowboards, Netscape sex shops, and Harry Potter drycleaners as examples of uses that weaken the commercial magnetism of famous marks and diminish the ability to evoke their original associations. *Visa Int'l Serv. Ass'n. v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010). In other words, "app store" must—and does not—have "such powerful consumer associations that even non-competing uses can impinge on their value." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999). Irrespective of whether "app store" is famous, Amazon's use of the term in Amazon Appstore for Android constitutes fair use and is not actionable. 15 U.S.C. §1125(c)(3).

---

[6]Apple's amended complaint also alleges state trademark dilution under Bus. & Prof. Code §14330. Amended Compl. ¶¶43-45. The California legislature repealed the statute in 2007. *See* Stats. 2007, c. 711 (A.B.1484), §1.

1

**1.   "App Store" Is Not A Famous Mark.**

The gateway requirement for establishing dilution is fame, and it is the rare mark that qualifies for the extraordinary scope of exclusivity given by anti-dilution laws.   15 U.S.C. §1125(c)(A); *Avery Dennison Corp.*, 189 F.3d at 875 ("to meet the 'famousness' element of protection under the dilution statutes, 'a mark [must] be truly prominent and renowned'").   A showing greater than distinctiveness is required so as "not to upset the balance in favor of over-protecting trademarks, at the expense of potential non-infringing uses." *Avery Dennison Corp.*, 189 F.3d at 875.

VISA is famous but "credit card" is not; FRUIT OF THE LOOM is famous but "underwear" is not; BARNES & NOBLE and AMAZON are famous but "bookstore" is not; and, while APPLE, iPOD, iPAD, and iTUNES might be famous, "app store" most certainly is not.   And protecting ownership rights over a generic term like "app store" is not what Congress had in mind in crafting anti-dilution laws.   Section II(a), *supra.  See Network Automation, Inc. v. Hewlett-Packard Company*, 2009 WL 5908719, at *11 (concluding that the mark at issue "is clearly not famous because it is generic . . .").

Four factors are probative in determining fame:

> (1) [t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) [t]he extent of actual recognition of the mark; [and] (4) [w]hether the mark was registered under the Act of March 3, 1882, or the Act of February 20, 1905, or on the principal register.   (15 U.S.C. §1125(c)(2)(A))

These factors weigh in Amazon's favor: Apple does not own a registration; it did not coin the mark in controversy; and, the popularity of the iPhone[7] notwithstanding, even Apple refers to its App Store as an "applications store" and an "electronic store".   *See* Part A(2), *supra*.  Apple also has presented no survey or expert opinion regarding the extent of actual recognition of the mark.  *See Network Automation,* 2009 WL 5908719 at *11; *cf. Visa Int'l Serv. Ass'n*, 590 F. Supp. 2d 1306, 1315 (D. Nev. 2008) (survey demonstrating that 99% of respondents were aware of the VISA brand weighed heavily in favor of a finding of fame)).[8]

---

[7]Apple's attempt to conflate the alleged popularity of its iPods, iPads, and iPhones with the purported fame of the term "app store" (*see, e.g.*, Fischer Decl. ¶¶9, 10, 16) is a red herring.  The relevant inquiry is not whether Apple's products are popular.  It is whether the term "app store" is a famous and exclusive source indicator for Apple.

[8]Leonard offers not a survey but a purported "linguistic analysis of the term APP STORE" (Leonard Decl. ¶11) based on review of usage of "app store" in databases, the internet, and dictionaries (*id.* ¶23).

1   The cases on which Apple relies further demonstrate that "app store" is not famous.  Mot. at 18.  In

2   *Hotmail Corp. v. Van$ Money Pie Inc*., 47 U.S.P.Q. 2d 1020 (N.D. Cal. 1998), this Court found that

3   HOTMAIL was famous because, among other things, Hotmail had developed the "arbitrary and fanciful"

4   mark (*id*. at 1023) and it had established consumer recognition (*id*. at 1024).  Similarly, in *Jada Toys, Inc. v.*

5   *Mattel, Inc*., 518 F.3d 628 (9th Cir. 2008), the Ninth Circuit deemed HOT WHEELS to be sufficiently

6   famous because it was a registered, arbitrary mark coined by Mattel (*i.e*., they are toy miniature cars and not

7   wheels that are hot).   *Compare Network Automation*, 2009 WL 5908719 (finding NETWORK

8   AUTOMATION not famous); *Vallavista Corp. v. Amazon.com, Inc*., 657 F. Supp. 2d 1132. 1137 (N.D. Cal.

9   2008) (finding TAXI WALLET not famous); *Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 466-67

10   (S.D.N.Y 2007) (finding BIO-SAFE septic system cleaner not famous); *TCPIP Holding Co., Inc. v. Haar*

11   *Commc'ns, Inc*., 244 F.3d 88, 98 (2d Cir. 2001) (finding THE CHILDREN'S PLACE for retail stores

12   selling children's clothing was not famous); *Hasbro, Inc. v. Clue Computing, Inc*., 66 F. Supp. 2d 117, 130-

13   32 (D. Mass. 1999), *aff'd* 232 F.3d 1 (1st Cir. 2000) (finding CLUE for board games was not famous

14   because it "is a common word that numerous third parties use").

15               **2.    There Is No Likelihood Of Dilution By Blurring.**

16   Dilution by blurring occurs when consumers form new and different associations with a famous mark.

17   15 U.S.C. §1125(c)(2)(B).  This Court need go no further than the case on which Apple relies, *Visa*

18   *International*—where defendant conceded VISA was famous—to conclude that Apple's claim must fail.

19   *Visa International*, which decided that eVisa, an internet multilingual education and information business,

20   was likely to dilute the VISA mark, explained that "dilution always involves use of a mark by a defendant

21   that is 'different' from the plaintiff's use; the injury addressed by anti-dilution law in fact occurs when marks

22   are placed in new and different contexts, thereby weakening the mark's ability to bring to mind the

23   plaintiff's goods or services."  610 F.3d at 1092.  Here, both Apple and Amazon are using "app store" to

24   refer to their respective stores that sell apps, and Apple has failed to demonstrate that Amazon Appstore for

25   Android is in any way eroding its ability to clearly identify Apple's App Store.

26   The specific factors used to analyze blurring also weigh in Amazon's favor:

27   (i) the degree of similarity between the mark or trade name and the famous mark; (ii) the
     degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the

28   owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the

HowardRice

1    degree of recognition of the famous mark; (v) whether the user of the mark or trade name
2    intended to create an association with the famous mark; (vi) any actual association between
     the mark or trade name and the famous mark. 15 U.S.C. §1125(c)(2)(B)

3    With respect to the first two factors, "app store" is generic so the similarity of the terms is irrelevant.

4    Apple's argument in this regard is akin to a claim that there is dilution by blurring because Strand Bookstore

5    and Kepler's Books both use "Book" in their names. Third, many retailers use "app store" to refer to their

6    stores and there are thousands of active registered domain names containing "app store." Part A(3), *supra*.

7    The fact that there is not even more use of "app store" may be less a recognition that Apple owns the mark

8    and more a result of an unwillingness or inability to engage in expensive litigation with Apple. Fourth,

9    while Apple claims that its App Store enjoys widespread recognition, it fails to present any survey or expert

10   opinion regarding the extent of actual recognition of the mark and instead relies on a linguistic analysis of

11   the term "app store". Mot. at 20. Fifth, without factual support, Apple claims that Amazon intended to

12   create association with Apple's mark. *Id.* at 20-21. Apple confuses Amazon's position that Apple has no

13   ownership rights in "app store" with improper free-riding. Sixth, Apple concedes it has no evidence of

14   actual association between Apple's App Store and Amazon Appstore for Android. *Id.* at 21. It instead relies

15   on two semi-anonymous posts from "Frugalista" and "G155." Fisher Decl. ¶28 & Ex. 12. The Ninth

16   Circuit has rejected this type of evidence as unreliable. *Sony Computer Entertainment*, 203 F.3d at 609.

17              **3.    There Is No Likelihood Of Dilution By Tarnishment.**

18        "So long as the defendant's use does not place plaintiff's trademark in a degrading or disparaging

19   context, tarnishment will probably not be found." *McCarthy* §24.89 at 24-239. Accordingly, tarnishment

20   typically applies only when plaintiff's mark has been linked with "something unsavory or degrading." *Toho*

21   *Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir. 1981) (use of BAGZILLA on strong garbage

22   bags did not dilute GODZILLA); *see also Ty Inc. v. Perryman*, 306 F.3d 509 (7th Cir. 2002) (using

23   hypothetical of TIFFANY being used to brand a strip joint); *Toys "R" Us, Inc. v. Akkaoui*, No. C 96-3381

24   CW, 1996 WL 772709 (N.D. Cal. Oct. 29, 1996) (TOYS R US tarnished by ADULTS R US for Internet

25   site for the sale of adult sexual products). There is nothing unsavory or degrading about Amazon Appstore

26   for Android.

27        Apple's theory that Amazon Appstore for Android is inferior to Apple's App Store is legally and

28   factually incorrect. The Ninth Circuit rebuffed a substantially similar argument in *Sony Computer Entm't*,

HowardRice

1   *Inc. v. Connectix Corp.*; namely, that tarnishment resulted because Connectix's Virtual Game Station did not

2   play PlayStation games as well as Sony's PlayStation console.  203 F.3d 596, 608-09 (9th Cir. 2000).  In

3   reversing the district court's finding of misattribution, the Ninth Circuit explained that it was not persuaded

4   "that the difference in quality between the two platforms is itself sufficient to find tarnishment."  *Id.* at 609.

5       Moreover, Apple's factual assertions regarding the alleged inferiority of Google's competing Android

6   operating system (Mot. at 21-23) are incorrect.  *See* Declaration of Ameesh Paleja ¶¶6-7.  There is nothing

7   "cheap or shoddy" (Mot. at 22) about Android or Amazon Appstore for Android.   No tarnishment is

8   possible.

9       **4.    Amazon's Use Of "App Store" In "Amazon Appstore For Android" Is A Fair**

10           **Use.**

11       Even assuming *arguendo* that "app store" is famous—and it is not—Amazon's use of the term in

12   Amazon Appstore for Android constitutes fair use and is not actionable.  Where a defendant uses a term for

13   its common meaning, as Amazon does here, there can be no liability.  *See* 15 U.S.C. §1125(c)(3)(A)

14   (allowing "[a]ny fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a

15   famous mark by another person other than as a designation of source").  Amazon does not use the term "app

16   store" as a trademark.  Instead, Amazon Appstore for Android tells the consumer three things:  *whose*

17   service it is (Amazon's), *what* the service is (an app store), and *what type* of apps are offered (for Android).

18   *Visa International* is illustrative:

19       > Visa does not claim that it could enforce its Visa trademark to prevent JSL from opening
        > 'Orr's Visa Services,' any more than Apple could shut down Orr's Apple Orchard or Camel
20       > could fold up Orr's Camel Breeders. Visa doesn't own the word 'visa' and may not 'deplete
        > the stock of useful words' by asserting otherwise.  Conferring anti-dilution rights to common
21       > English words would otherwise be untenable, as whole swaths of the dictionary could be
        > taken out of circulation. Nor would a suit against Orr's Visa Services advance the purpose of
22       > anti-dilution law. Such use of the word would not create a new association for the word with a
        > product; it would merely evoke the word's existing dictionary meaning, as to which no one
23       > may claim exclusivity. (*Id.* at 1091)

24       Unlike the generic use of "app store", eVisa was not using "visa" for its literal definition but to

25   identify a "multilingual education and information business."  610 F.3d at 1092.  The Ninth Circuit took care

26   to note that it "would be a different case" if "visa" was being used for its common English definition.  *Id.*

27

28

**III.   APPLE HAS FAILED TO DEMONSTRATE THAT IT WOULD BE IRREPARABLY HARMED WITHOUT A PRELIMINARY INJUNCTION.**

Apple also fails in its burden to show that it would be irreparably harmed without a preliminary injunction. Apple made the deliberate decision to market its app store under the generic name "App Store." *See Advertise.com, Inc. v. AOL Adver., Inc.*, 616 F.3d 974, 980 n.6 (9th Cir. 2010) (in response to AOL's argument that refusing to protect the generic mark ADVERTISING.COM would result in "parasite" marks diverting business from AOL, stating that "this is the peril of attempting to build a brand around a generic term"); *Microsoft*, 64 U.S.P.Q. 2d (BNA) at 1410 (noting when considering the balance of harms that Microsoft's "risky decision to name its product after a term commonly used in the trade to indicate the windowing capability of a GUI" weighed against a finding that it would be harmed by a competitor's use of the term).

**IV.   A PRELIMINARY INJUNCTION WILL IRREPARABLY HARM AMAZON.**

The preliminary injunction sought by Apple would irreparably harm Amazon. It would force Amazon to shut down Amazon Appstore for Android while it arranges for a new designation. It would prevent Amazon from calling its app store what it is—an app store. It would harm consumer confidence in Amazon's good and services. *See* Rubenson Decl. ¶¶8-10.

Moreover, despite the very substantial bond that should be required if a preliminary injunction were to issue (*see* Rubenson Decl. ¶10), a preliminary injunction forcing Amazon to change the name of Amazon Appstore for Android would be difficult to monetize once Amazon prevails after a full trial on the merits. Moreover, any reversal of a preliminary injunction after Amazon prevails at trial would be too late because it would be economically damaging and confusing to Amazon's partners and customers to switch back to the original name. *See, e.g.*, *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F. Supp. 340, 350-51 (D.N.J. 1996) (where defendant recently adopted a brand, a preliminary injunction would "call into question the stability and integrity of defendant's store"; recognizing that the balance of harms favored defendant because "if defendant were forced to preliminarily change its name and then succeed in this lawsuit, it would be economically unsound and, most likely, financially unfeasible for defendant to return to its original name"); Rubenson Decl. ¶¶9-10.

**V.    PUBLIC INTEREST WEIGHS AGAINST A PRELIMINARY INJUNCTION.**

Public interest weighs against granting an injunction giving Apple a monopoly on commercial use of a generic term.  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002) ("While the public and the trademark owner have an interest in preventing consumer confusion, there is also a broad societal interest in preserving common, useful words for the public domain.  We do not want to prevent the commercial use of descriptive words to name products, as straightforward names are often the most useful identifiers").  Allowing such an illegitimate monopoly would be contrary to public interest.  *Kellogg Co. v. Nat'l Biscuit Co*., 305 U.S. 111, 122 (1938) ("Sharing in the goodwill of an article unprotected by . . . trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested").

## CONCLUSION

For the above reasons, Apple's Motion for Preliminary Injunction must be denied.

DATED: June 1, 2011.                              Respectfully,

                                                  MARTIN R. GLICK
                                                  CLARA J. SHIN
                                                  SARAH J. GIVAN
                                                  HOWARD RICE NEMEROVSKI CANADY
                                                       FALK & RABKIN
                                                  A Professional Corporation

                                                  By:  _____/s/ *Martin R. Glick*_____
                                                               MARTIN R. GLICK

                                                  Attorneys for Defendants AMAZON.COM, INC. and
                                                  AMAZON DIGITAL SERVICES, INC.